**In re Terrie M. MATTSON, Debtor.**

**Bankruptcy No. 97–41480.**

United States Bankruptcy Court, D. Minnesota.

July 8, 1997.

Clinton E. Cutler, Fredrikson & Byron, Minneapolis, MN, for Debtor.

Steven H. Bruns, Esther E. McGinnis, Peterson, Fram & Bergman, P.A., St. Paul, MN, for Defendant.

*ORDER PARTIALLY OVERRULING OBJECTION TO CONFIRMATION*

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for hearing to consider confirmation of the debtor's plan filed February 27, 1997, and Commercial Credit Consumer Services, Inc.'s, objection to confirmation. Clinton E. Cutler appeared for the debtor and Steven H. Bruns and Esther E. McGinnis appeared for Commercial Credit. This court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 1070–1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

For reasons stated in this memorandum, I am partially overruling the objection of Commercial Credit, and will schedule an evidentiary hearing on confirmation of the debtor's plan so that the amount of Commercial Credit's allowed secured claim can be determined.

## BACKGROUND

The debtor purchased a home for herself and her son in June of 1994 for $49,900.00. She obtained a $47,405.00 loan from Norwest Mortgage, Inc., secured by a first priority mortgage on her home and borrowed an additional $1,500.00 from a special loan program. She paid the balance in cash. The $1,500.00 loan has been repaid. Norwest has not filed a claim, but the debtor's Schedule D indicates a debt to Norwest of $46,500.00.

In the fall of 1995, the debtor received an unsolicited letter in the mail from Commercial Credit. In response to the solicitation the debtor contacted Commercial Credit and went to its office in Burnsville on approximately November 2, 1995. While the debtor filled out an application to borrow $5,000.00 to refinance some credit card debt, Commercial Credit offered to loan her $10,000.00 secured by a second mortgage on her home. There apparently was no discussion about the value of the home or current encumbrances.

On November 2, 1995, the debtor signed a promissory note in the amount of $10,202.06 and granted Commercial Credit a second mortgage on her home to secure repayment. The repayment was amortized over five years with the last payment on the mortgage due November 7, 2000. The debtor was current on her payments until about a month before she filed her chapter 13 case on February 27, 1997. She has filed a plan in which she proposes to treat Commercial Credit as an unsecured creditor.

## THE PARTIES' POSITIONS

The debtor claims that she can treat the Commercial Credit claim as an unsecured claim. It is her belief that the value of the home is less than the amount of Norwest's first mortgage, leaving Commercial Credit totally unsecured. As a result, she feels that she can utilize the cramdown provisions of chapter 13 and pay Commercial Credit as an unsecured creditor.

Commercial Credit, on the other hand, believes that the value of the debtor's homestead is in excess of the first mortgage and therefore its claim is secured in whole or in part. In addition, Commercial Credit argues that, regardless of the value of the home, its claim must be paid in full as a result of the special protection granted to holders of security interests in real property that is the debtor's principal residence.

The debtor counters that Commercial Credit is not entitled to that protection for two reasons: First, since its claim is totally unsecured, it does not enjoy the protections afforded to home mortgages and second, she can cram down on Commercial Credit since the last payment on its debt is due before the end of the debtor's plan.

## DISCUSSION

■ I have already rejected the debtor's first argument and will not revisit it here. *In re Hussman,* 133 B.R. 490 (Bankr. D.Minn.1991). The Supreme Court has also addressed this same principle, although not in this precise context. *Nobelman v. American Sav. Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). A creditor with a mortgage is secured by the underlying property even if, for bankruptcy purposes, it has no allowed secured claim and therefore is entitled to the protection afforded home mortgages by 11 U.S.C. § 1322(b).

The debtor's second argument is of more recent origin and more troublesome. While a number of courts have addressed § 1322(c)(2), only two reported cases directly address the issue of cramdown. Commercial Credit's position is supported by a recent opinion of the Fourth Circuit. *Witt v. United Companies Lending Corp. (In re Witt),* 113 F.3d 508 (4th Cir.1997), *affirming, In re Witt,* 199 B.R. 890 (Bankr.W.D.Va.1996). Its opinion is flawed, however, in that it attempts to divine the will of Congress and then combine the results of its understanding with a misapplication of the Supreme Court's holding in *Nobelman* to reach an erroneous result. The correct result is easily reached

by a straightforward reading of the statute, which is consistent with both the scant legislative history of § 1322(c)(2) and the opinion in *Nobelman.*

The definitive opinion on § 1322(c)(2) has already been written. *See In re Young,* 199 B.R. 643 (Bankr.E.D.Tenn.1996). In *Young,* Judge Parsons does a complete job of analyzing the statute, its history and purposes, and applying it in a situation like this one. She agrees with the debtor's position. I wholeheartedly endorse her opinion.

I should stop at this point, but cannot resist adding my own spin on the issue with the following thoughts:

■■■ (1) Cramdown is the centerpiece of the reorganization chapters. Cramdown starts with § 506(a) which basically provides that a creditor holding a security interest in property has a secured claim only to the extent that there is value in that property to provide actual security for its claim. In a situation like ours, this means that Commercial Credit has a secured claim only to the extent of the difference between the value of the debtor's homestead and Norwest Mortgage, Inc.'s, debt, less any other prior encumbrances on the property, such as real estate taxes. The basic rule of cramdown is that, under a plan, a debtor must make payments to a secured creditor which have a value equal to the debtor's allowed secured claim, which is not necessarily its entire claim. *See* 11 U.S.C. §§ 1129(b)(2)(A)(i), 1225(a)(5)(B), and 1325(a)(5)(B).

(2) Cramdown as a general principle is recognized in chapter 13. With one major exception which I will get to later, § 1322(b)(2) provides that a plan may "modify the rights of holders of secured claims . . . or of holders of unsecured claims. . . ." Section 1325(a)(5)(B) then goes on to specify that, as to secured creditors, unless the debtor surrenders the creditor's collateral or the creditor accepts some other treatment, that the creditor must retain its lien and receive value, as of the effective date of the plan, not less than the allowed amount of such claim. This is the essence of cramdown and, in the absence of other applicable provisions, the debtor would be correct and the only issue would be one of valuation.

(3) There is more, of course. The provision in § 1322(b)(2), quoted in the previous paragraph, above providing for the modification of the rights of holders of secured claims, specifically provides that the debtor may not modify such rights if the claim is "secured only by a security interest in real property that is the debtor's principal residence." The parties agree that Commercial Credit has such a claim and that if there were no more applicable provisions, then Commercial Credit would be right. The debtor would have to pay Commercial Credit in full according to the terms of its mortgage and note. This is what the Supreme Court's opinion in *Nobelman* settled.

(4) There is yet more. Section 1322(b)(5) provides:

> notwithstanding paragraph (2) of this subsection, [a plan may] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

This provision has been in the Bankruptcy Code since it was enacted in 1978. This language acts as an exception to the exception that we just talked about. It provides that, even though § 1322(b)(2) says that the rights of a home mortgagee may not be modified, that a plan may modify them to a limited extent. The only modification allowed under § 1322(b)(5) is a modification dealing with the payment of defaults. Those defaults can be paid over a reasonable time. Since § 1322(b)(5) applies only to those creditors whose last payment is due after the final payment under the plan, it does not apply in this case. However, it is important to understand the full framework of these provisions.

(5) The last piece of this puzzle is a new one. Congress added a new § 1322(c) in 1994, and renumbered the old § 1322(c) as § 1322(d). In particular, § 1322(c)(2) applies to this case. It is worth quoting this section in full:

Notwithstanding (b)(2) and applicable non-bankruptcy law—

... (2) In a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. § 1322(c)(2).

■ (6) Since the last payment to Commercial Credit comes due before the last payment under the plan, the parties agree that this subsection applies to the Commercial Credit debt. What the parties cannot agree on and what the cases are split on is what this provision says. In *Witt,* the Fourth Circuit parses the sentence in a very odd way, by holding that the last clause "as modified pursuant to § 1325(a)(5) of this title" modifies the word "payment" rather than its direct antecedent "claim." Such a reading is unnatural and violates rules of both common sense and grammar, not to mention the last antecedent rule of statutory construction. The Fourth Circuit seems to have a preconceived notion about what this section is trying to do, based primarily on its scant bit of legislative history. They use this understanding of congressional intent to thereby create this strained meaning, or at least create an ambiguity, which they then proceed to resolve by resorting to the same legislative history they used to create the ambiguity in the first place.

The *Young* court uses a more straightforward and, if I can use the phrase, "plain meaning" analysis of the section. It begins with the words "notwithstanding subsection (b)(2)." We are therefore to ignore subsection (b)(2), at least to the extent that it is inconsistent with the language that follows. While part of § 1322(b)(2) says that the rights of home mortgagees may not be modified, § 1322(c)(2) says ignore that language. In certain limited circumstances which obtain here, the debtor may in fact utilize the provisions of § 1325(a)(5) to cram down on the secured creditor, i.e., a return to the general rule of treatment of secured claims.

(7) If Congress had wanted to adopt the rule proposed by Commercial Credit it could have done so much more easily by mimicking the language of § 1322(b)(5). It did not do so; instead it chose to adopt a whole new subsection and use different language.

(8) A few words about legislative history. Those of us who deal with bankruptcy laws are forever vexed by the paucity of appropriate legislative history. Instead of committee reports, which constitute the customary legislative history of federal statutes, we are left with conference committee statements, floor statements, and even *ex post facto* statements by key legislators. The statute at hand is a good example. The briefly stated purpose of the provision suggests that it was to overrule *First Nat'l Fidelity Corp. v. Perry,* 945 F.2d 61 (3d Cir.1991). However, the new § 1322(c)(2) has little, if anything, to do with *Perry. Perry* had to do with whether or not there were defaults still existing in a mortgage to be cured. In fact, if anything, it is § 1322(c)(1) which deals with the situation in *Perry* and a lot of other cases which struggled with determining at what point, in a mortgage foreclosure process, there are no longer "defaults." Section 1322(c)(1) settled that issue by stating a rule that the courts could rely on in making that determination. For a good critique of the legislative history, see *In re Jones,* 188 B.R. 281 (Bankr.D.Or. 1995).

(9) A few more words about legislative history. The Fourth Circuit makes much about the fact that the commentary to § 1322(c)(2) does not mention an intent to overrule *Nobelman.* First, while § 1322(c)(2) provides an additional exception to § 1322(b)(2) as interpreted in *Nobelman,* the new section does not purport to overrule *Nobelman,* so it is no surprise that the legislative history does not say it does. In addition, when notes are cobbled together at the last minute as it was for the Bankruptcy Reform Act of 1994, we should not put too much stock in what it says, much less what it does not say. As one commentator put it:

Because new section 1322(c)(2) is preceded by the words 'notwithstanding subsection (b)(2) and applicable nonbankruptcy law,'

Chapter 13's no modification clause as read in *Nobelman* would not apply.

Marianne B. Culhane, *Home Improvement? Home Mortgages and the Bankruptcy Reform Act of 1994,* 29 Creighton L.Rev. 467, 491 (1996).

(10) The reason for the rule against modification of home mortgages seems to be an intent to encourage the flow of capital into the home lending market. *Nobelman v. American Sav. Bank,* 508 U.S. 324, 331, 113 S.Ct. 2106, 2111, 124 L.Ed.2d 228 (1993) (Stevens J., concurring). Section 1322(c) addresses mortgages that have nothing to do with the home mortgage market. The section will typically apply to second mortgages such as this one, which are based very little on the value of the home and more on the leverage provided by having a mortgage on a debtor's homestead. A true first mortgage, payable over a longer term (typically 30 years), will rarely, if ever, be undersecured, especially when the last payment is coming due during the terms of a plan. While I will concede that occasionally this provision could catch such a home mortgage, it will be so rare as to have no effect on the home mortgage market. Thus, it is not at all unlikely that Congress saw a distinction between the type of mortgage that exists here and the type of mortgage that it sought to protect in § 1322(b)(2). To again quote Professor Culhane:

> The plain language of the amendment seems to allow lien stripping in this limited context. It would tend to target only those riskier mortgages which were probably undersecured from the outset. If the debtor is near the end of the payments on a long-term purchase money mortgage before she defaults, ... the remaining unpaid balance will almost certainly be fully secured. If the mortgage was originally short-term, however, and is undersecured at the time of bankruptcy, ... it may well have been undersecured from the time it was made. Such loans were, after all, expressly targeted for stripping in an earlier reform bill.

Culhane, *supra,* at 491.

(11) It is worth repeating that the effect of the provision is really not extraordinary. It provides only that such mortgages are treated like bankruptcy treats virtually all other secured creditors, save only the special provisions provided for the more traditional home purchase lender.

## CONCLUSION

I will overrule Commercial Credit's objection to the extent that it relies on § 1322(c)(2). However, an evidentiary hearing is still necessary. Depending on the value of the debtor's homestead, Commercial Credit may or may not have an allowed secured claim. If it does, the debtor's plan would be unconfirmable since it proposes to treat Commercial Credit as a totally unsecured creditor.

THEREFORE, IT IS ORDERED:

1. The objection of Commercial Credit Consumer Services, Inc., is overruled in part.

2. An evidentiary hearing on confirmation of the debtor's plan is set for August 6, 1997, at 3:00 p.m. in courtroom 8 West, 300 South Fourth Street, Minneapolis, Minnesota.