**In re Roxanne Jewel McCARRON, Debtor.**

**Roxanne Jewel McCarron, Debtor,**

**v.**

**Firstplus Financial, Respondent.**

**Bankruptcy No. 99–44137–W–JWV.**

United States Bankruptcy Court, W.D. Missouri, Western Division.

Jan. 5, 2000.

Maurice B. Soltz, Kansas City, MO, for plaintiff.

Mark J. Schultz, Kansas City, MO, for defendant.

## MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

In this Chapter 13 case, the Debtor, Roxanne Jewel McCarron ("Debtor"), seeks to void and thereby treat as unsecured in her Chapter 13 Plan the second mortgage lien on her home which is held by FirstPlus Financial, Inc. ("FirstPlus"). This presents, for the first time in this Court since the United States Supreme Court's holding in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (hereinafter "*Nobelman* "), the issue of whether a debtor can modify the rights of a junior mortgage holder under 11 U.S.C. § 1322(b)(2) when the junior mortgagee's claim is totally unsecured.

For the reasons set out below, the Court will allow the Debtor to "strip off" First-Plus's second mortgage lien because First-Plus's claim is totally unsecured and is therefore subject to modification under § 1322(b)(2), and will allow the Debtor to treat the claim as unsecured in her Chapter 13 Plan.

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334. This is a core proceeding which the Court may hear and decide pursuant to 28 U.S.C. § 157(b)(2)(A), (K), and (O). This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law. Fed.R.Bankr.P. 7052.

## FACTUAL BACKGROUND

The Debtor, a single woman, purchased her home at 327 Kensington, Kansas City, in August 1996 and executed a first deed of trust in favor of Patriot Financial Group, Inc., to secure a large portion of the purchase price. By virtue of numerous assignments, this first deed of trust is now held by GMAC Mortgage Corp., and the balance owing on the underlying promissory note is $52,854.68 (according to the claim filed by GMAC). On June 2, 1997, the Debtor executed a promissory note and second deed of trust to FirstPlus, and the balance owing on this second mortgage note was, at the time of filing, $11,190.54 (according to the claim filed by FirstPlus). There is no dispute that both of the mortgages were properly perfected, and there is no dispute concerning the amounts owed on the notes. Nor is there any argument that the Debtor occupies the house at 327 Kensington as her principal (and only) residence.

A Chapter 13 Petition was filed by the Debtor on October 25, 1999. On that same date, the Debtor filed a motion (which she styled "Application to Avoid Lien Secured by Real Property Under Section 502" (sic)) seeking a valuation hearing under § 502; a determination of the validity, priority, or extent of FirstPlus's interest in the real property; a declaration that the lien is void under § 506(d); and a holding that the mortgage lien of FirstPlus can be classified and paid in the Debtor's Chapter 13 Plan as an unsecured claim. FirstPlus filed a Response in which it stated that the Debtor had valued her house at $52,000.00 when she obtained her second mortgage

and that FirstPlus should, therefore, be at least partially secured.[1] FirstPlus further stated that, regardless of whether its lien was only partially secured or totally unsecured, the lien could not be declared void because of the Supreme Court's holding in *Nobelman*. Counsel for FirstPlus filed Suggestions in support of its position.

A hearing was held on the Debtor's Application on November 22, 1999. The Debtor testified that she borrowed approximately $10,000.00 from FirstPlus after receiving a mailed solicitation, and that the money was used to pay other debts. It was not used to purchase her house or pay for repairs or improvements on the house. The Debtor testified that she had listed the value of her house at $52,000.00 on the loan application because that was the full amount she had paid for the property, including all closing costs and incidental fees, in 1996. The Debtor called two valuation witnesses. Duane Witherspoon, an appraiser for the Jackson County assessor's office and a state certified residential appraiser, testified that the assessed value of the Debtor's property is $42,457.00. This valuation was based largely on the relative assessed values of other homes in the immediate vicinity, inasmuch as Witherspoon had not been inside the house but had done only a "drive-by appraisal." The second witness was Brian Bucksner, who might best be described as a property manager. Bucksner is not a certified appraiser, but testified that he has been

managing, selling and brokering single-family properties in the inner city area of Kansas City for the last 17 years. Bucksner had examined the Debtor's house and found that it was in serious need of maintenance and repairs that would cost more than $5,000.00. Based on the sales prices of comparable houses in the area and on the present condition of the property, Bucksner stated that the fair market value of the property would be, at most, $41,500.00, "if you could find someone dumb enough to pay that." Bucksner said that an investor would pay less than $30,000.00 for the property.

FirstPlus did not present any evidence on the value of the property. At the conclusion of the hearing, counsel for FirstPlus asked the Court to continue the hearing to allow FirstPlus to inspect the property and obtain its own appraisal, which could then be submitted to the Court. Counsel for the Debtor, quite obviously, objected. The Court denied the request and allowed the parties time to submit post-trial briefs. Counsel for the Debtor filed his brief on December 22, 1999. Counsel for FirstPlus advised the Court that he had been directed by his client not to file a brief or otherwise incur any further legal expenses on this matter.[2] The Court has considered the pre-trial suggestions filed by FirstPlus and the post-trial brief filed by the Debtor, has

---

1. FirstPlus made this assertion on the basis of the Debtor's pleading that the balance owed on the first mortgage was approximately $48,924.92 and on the Debtor's valuation of $52,000.00 for the property when she applied for her loan with FirstPlus. If these numbers had been accurate, FirstPlus would, indeed, appear to be partially secured ($3,075.08) on its second mortgage. However, GMAC subsequently filed its proof of claim for $52,854.68, which exceeds even the value placed on the property by the Debtor in her loan application.

2. Before beginning his cross-examination of the Debtor, counsel for FirstPlus advised the Court for the first time that FirstPlus Financial, Inc., is the Debtor in Chapter 11 pro-

ceedings in the Bankruptcy Court in Dallas, Texas. Counsel has never filed any Suggestions in Bankruptcy in this Court. Counsel consented to proceeding with the hearing, but requested that the Debtor take appropriate steps to obtain relief from the automatic stay. Counsel for the Debtor has advised the Court that he has complied with an Order entered by the Bankruptcy Court for the Northern District of Texas, Dallas Division, on April 28, 1999, setting out a special procedure for providing written documentation to the bankruptcy attorneys for FirstPlus in lieu of filing a motion to lift the automatic stay. Provided that the Debtor has so complied, lifting of the stay would not be required and this matter may proceed.

conducted its own research on the issues involved, and is now ready to rule.

## DISCUSSION

### A. The value of the property.

█ The threshold question to be decided by the Court is the fair market value of the Debtor's residential property, pursuant to § 506(a) (not § 502, as pleaded by the Debtor, for reasons which are unclear to the Court). The valuation of the property is critical, as will be seen.

The Court believes and finds that the fair market value of the Debtor's residential property was not more than $41,500.00 on the date the petition was filed. This conclusion is based on the testimony of Brian Bucksner, who exhibited a thorough knowledge of the Debtor's property and, more importantly, of the market for single-family residences in the inner city of Kansas City. Even the $41,500.00 may be high; Bucksner said that would depend on finding someone "dumb enough to pay that much ..." The Court must respectfully discount the testimony of Duane Witherspoon because his valuation of $42,457.00 was prepared for tax assessment purposes only, not for the purpose of determining present market value, and he had not inspected or examined the house and apparently was not aware of the actual condition of the house. As previously noted, First-Plus did not adduce any evidence of value.

Therefore, for purposes of this proceeding, the value of the Debtor's residential property is found to be $41,500.00. 11 U.S.C. § 506(a).

### B. Section 1322(b) and *Nobelman*.

█ The primary issue presented by this case is whether a debtor proposing a payment plan under Chapter 13 of the Bankruptcy Code may "strip off" the lien of a creditor holding a junior lien that is

**3.** "[I]n recent *Nobelman* related litigation, the term 'strip off' is applied where a junior mortgagee is totally unsecured as to the debtor's principal residence, while the term 'strip

(1) "secured only a security interest in real property that is the debtor's principal residence," § 1322(b)(2), and (2) wholly "unsecured" in terms of § 506(a). For the reasons set out below, the Court holds that "strip off" is permissible and will be allowed in this case.[3]

Initially, we would observe that this issue has been widely debated in the bankruptcy courts around the country and has been examined from every possible angle, it seems, in numerous published opinions. The bankruptcy courts appear to be almost evenly divided on whether "strip off" should or should not be allowed. We would also note that this issue is one of first impression for this Court, and the Court's research has not uncovered any published opinion of any Circuit Court of Appeals, including the Eighth Circuit, in which this issue has been directly addressed. Having said this, we turn to our analysis of this divisive issue.

A debtor's proposed payment plan must comply with the guidelines set forth in § 1322(b), which provides, among other things:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
>   *   *   *   *   *   *
>
> (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b) (emphasis added).

Whether a claim that is "secured" under commercial law (that is, one that is secured by a perfected lien on real or personal property) is a "secured claim" for Bankruptcy Code purposes is determined by 11 U.S.C. § 506(a), which provides in pertinent part:

down' is still used where a mortgage is partially secured, and partially unsecured." *In re Woodhouse,* 172 B.R. 1 at n. 1 (Bankr. D.R.I.1994).

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. 11 U.S.C. § 506(a).

The interplay of these sections was examined by the Supreme Court in *Nobelman*, and it is the differing interpretations of the Court's opinion in *Nobelman* that has led to the split in decisions in the bankruptcy courts (and district courts) on this issue. In *Nobelman*, the debtors' home, which was worth just $23,500.00 (after a severe recessionary period in Texas), was encumbered with a single homestead lien of $71,335.00. The debtors sought to bifurcate the lien into a secured claim of $23,500.00 and an unsecured claim of $47,-835.00, and then proposed to pay only the secured claim in full. They argued that the "other than" clause of § 1322(b)(2), emphasized above, protected only that part of the claim that was determined to be secured under § 506(a), and that the unsecured component could be "stripped down" and treated in the plan as an unsecured claim. The creditor opposed this treatment, arguing that such a bifurcation would modify its rights in violation of § 1322(b)(2).

First, the *Nobelman* Court stated that the debtors were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim. "It was permissible for petitioners [debtors] to seek a valuation in proposing their Chapter 13 plan, since § 506(a) states that '[s]uch value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest.'" *Nobelman*, 508 U.S. at 328, 113 S.Ct. at 2109–10. Therefore, it is appropriate for debtors proposing a Chapter 13 plan to seek a valuation of the residential property which is subject

to the creditor's lien, for the purposes of formulating an acceptable repayment plan. That is what the Debtor has done in this case.

Second, the Supreme Court rejected the debtors' contention that the anti-modification provision in § 1322(b)(2) applied only to the secured portion of the creditor's claim. Rather, the Court held that the language in the statute ("a claim secured only by a security interest ... in the debtor's principal residence") refers to the lienholder's entire claim, "including both the secured and the unsecured components of the claim." *Id.* at 331, 113 S.Ct. at 2111. The Court stated that it would be impossible for the debtors to modify the payment and interest terms for the unsecured component of the claim without also modifying the terms of the secured component, which would be in violation of the statute. *Id.* Accordingly, the Court held that "§ 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence." *Id.* at 325–26, 113 S.Ct. at 2108.

The *Nobelman* case is clearly distinguishable from the present case. In *Nobelman*, the Court was confronted with determining the rights of a creditor who had a claim that was partially secured and partially unsecured. However, in the present case we have a creditor whose claim is totally unsecured, in that the value of the Debtor's residential property ($41,-500.00) is less than the amount of the first mortgage ($52,854.68). Because First-Plus's second mortgage claim is completely unsecured, it does not come within the "other than" provision of § 1322(b)(2) that was at issue in *Nobelman*. Therefore, the reasoning in *Nobelman* should not be applied to this case, because FirstPlus is not the holder of a secured claim. It is the holder of a totally unsecured claim. To be protected from modification under § 1322(b)(2), "the second mortgagee must

have at least some interest in the property securing its claim after satisfaction of the senior mortgage." *Sette v. Bello (In re Sette)*, 164 B.R. 453, 455 (Bankr.E.D.N.Y. 1994).

Since FirstPlus's claim is totally unsecured, there is nothing to prevent the Debtor from modifying that claim in her Chapter 13 Plan. At this point, the other provision of § 1322(b)(2), relating to unsecured claims, comes into play. It provides that a debtor's plan "may modify the rights of ... holders of unsecured claims ..." Unlike the exception made for holders of unsecured claims, there is no exception to the unsecured claims clause, and therefore the rights of a holder of an unsecured claim are not protected from modification. *In re Mitchell*, 177 B.R. 900, 902 (Bankr.E.D.Mo.1994); *In re Hornes*, 160 B.R. 709, 711 (Bankr.D.Conn.1993).

We believe that the *Nobelman* Court recognized that a distinction would be made between bifurcated claims and totally unsecured claims. In *Nobelman*, the Court expressly recognizes that a determination of the value of the residence is necessary to a determination of whether the creditor's claim is to be treated as secured, undersecured, or wholly unsecured. "Petitioners were correct in looking to § 506(a) for a judicial valuation of the collateral *to determine the status* of the bank's secured claim." *Nobelman*, at 328, 113 S.Ct. at 2110 (emphasis added). If the value of the collateral was not a factor, there would be no need to look to § 506(a). The inquiry would simply be whether the creditor had a state law perfected lien ("a claim secured only by a security interest in ... the debtor's principal residence") and, if so, the debtor would be prohibited from modifying the claim in any way because of the prohibition of the "other than" clause of § 1322(b)(2).

Finally, we believe that a refusal to allow the Debtor to strip off FirstPlus's

totally unsecured claim would have the anomalous result of giving FirstPlus greater rights and more favorable treatment in this bankruptcy proceeding than it would receive outside bankruptcy. In bankruptcy, the unsecured creditors are the last to be paid; however, if FirstPlus were allowed to retain its lien on the Debtor's home, despite being unsecured, it would have the right to full payment under the Plan, a benefit that no other unsecured creditor would receive. Outside bankruptcy, a totally unsecured junior lienholder, like FirstPlus, would receive nothing in a foreclosure proceeding by the senior lienholder, because all proceeds would go to the senior lienholder and to pay the costs of foreclosure, and its lien would be extinguished. Such a result would be contrary to the spirit as well as the letter of the Code.

█ This Court concurs with the conclusions reached by the Honorable Robert L. Krechevsky in *Matter of Plouffe*, 157 B.R. 198, 200 (Bankr.D.Conn.1993):

> I find it evident from the *Nobelman* ruling that for a homestead mortgagee to claim the protection against modification granted by § 1322(b)(2), the mortgagee must qualify as the holder of a secured claim to some extent as determined by § 506(a). There is neither a logical nor rational basis for a creditor holding a completely unsecured claim to be protected from claim modification in a bankruptcy case simply because the creditor had obtained a lien on the homestead prepetition. "[T]reatment under the Code turns on whether a *claim* is secured or unsecured, not whether a *creditor* is secured or unsecured." *In re Bellamy*, 962 F.2d 176, 179 (2d Cir.1992).

\*      \*      \*      \*      \*      \*

Justice Stevens, in his concurring opinion in *Nobelman*, wrote that the Court's "literal reading of the text of the statute

is faithful to the intent of Congress." *Nobelman,* 508 U.S. at [332], 113 S.Ct. at 2112, 124 L.Ed.2d at 237. The intent to which Justice Stevens referred was "favorable treatment of residential mortgagees ... to encourage the flow of capital into the home lending market." *Id.* There are no such concerns when dealing with the second mortgage market. *See generally* Veryl Victoria Miles, *The Bifurcation of Undersecured Residential Mortgages Under § 1322(b)(2) of the Bankruptcy Code: The Final Resolution,* 67 Am.Bank.L.J. 207, 285 (1993) (junior lienholders who may take mortgages against oversecured property do not merit creditor protection by Congress). Further, a literal reading of § 1322(b)(2) *does* exclude a mortgagee whose secured interest in the homestead is zero. (emphasis in original)

This Court has reviewed many of the published opinions that have dealt with the issue presented in this case, and has carefully considered the differing interpretations of the provisions of § 1322(b)(2) and the Supreme Court's opinion in *Nobelman.* An extended discussion of those cases and the various arguments set out therein would likely add little to the debate.[4]

For the reasons set out hereinabove, it is therefore

**ORDERED** that the Debtor's Application to Avoid Lien Secured by Real Property Under Section 502 (sic) be and is hereby GRANTED, the fair market value of the Debtor's residential real property at 327 Kensington, Kansas City, Missouri, is set at $41,500.00, the second mortgage lien of FirstPlus Financial, Inc., on the residential real property is hereby declared void, the claim of FirstPlus Financial, Inc., is hereby determined to be totally unsecured, and the Debtor is hereby authorized to treat the claim of FirstPlus Financial, Inc., in her Chapter 13 Plan as an unsecured claim.

**SO ORDERED.**

---

4. This Court finds itself in much the same position as the Court in *In re Boehmer,* 240 B.R. 837 (Bankr.E.D.Pa.1999), recently found itself: "[U]ntil there is congressional action, or at least controlling appellate precedent, the situation is unlikely to remedy itself. Each judge will simply have to determine which of the two competing positions is to him or her the most persuasive. This Court, regrettably, finds itself unable to offer fresh insights into this nettlesome question, but it has carefully considered the many arguments which have been made and discussed by others." *Id.* at 842.

Some of the cases that support the Court's conclusion in this case, in addition to those cited above, are *Johnson v. Asset Management Group, LLC (In re Johnson),* 226 B.R. 364 (D.Md.1998); *In re Phillips,* 224 B.R. 871 (Bankr.W.D.Mich.1998); *Lam v. Investors Thrift (In re Lam),* 211 B.R. 36 (9th Cir. BAP 1997); *In re Bivvins,* 216 B.R. 622 (Bankr. E.D.Tenn.1997); *In re Reeves,* 221 B.R. 756 (Bankr.C.D.Ill.1998); *In re Smith,* 215 B.R. 716 (Bankr.W.D.Tenn.1998); *In re Cerminaro,* 220 B.R. 518 (Bankr.N.D.N.Y.1998); *In re Cervelli,* 213 B.R. 900 (Bankr.D.N.J.1997); *In re Thomas,* 177 B.R. 750 (Bankr.S.D.Ga. 1995).

As noted, there are numerous cases in which the Courts have not allowed a debtor to strip off the totally unsecured lien of the mortgagee. Some of those cases are *In re Boehmer,* 240 B.R. 837 (Bankr.E.D.Pa.1999); *In re Bauler,* 215 B.R. 628 (Bankr.D.N.M.1997); *Lewandowski v. U.S. Department of Housing and Urban Development (In re Lewandowski),* 219 B.R. 99 (Bankr.W.D.Pa.1998); *Tanner v. Firstplus Financial, Inc. (In re Tanner),* 223 B.R. 379 (Bankr.M.D.Fla.1998); *In re Neverla,* 194 B.R. 547 (Bankr.W.D.N.Y.1996); *In re Barnes,* 199 B.R. 256 (Bankr.W.D.N.Y.1996); *In re Witt,* 199 B.R. 890 (W.D.Va.1996); *In re Ortiz,* 241 B.R. 460 (Bankr.E.D.Cal.); *In re Shandrew,* 210 B.R. 829 (Bankr.E.D.Cal. 1997).