**In re Harold and Kathryn BLACK, Debtors.**

**Harold Black and Kathryn Black, Plantiffs,**

**v.**

**Conseco Finance Servicing Corp., Defendant.**

**Bankruptcy No. 00–42539M. Adversary No. 00–4103.**

United States Bankruptcy Court, E.D. Arkansas, Western Division.

March 27, 2001.

Stephen Bennett, Sherwood, AR, for debtors/plaintiff.

Kimberly Burnette, Little Rock, AR, for defendant.

## MEMORANDUM OPINION

JAMES G. MIXON, Chief Judge.

The issue before the Court is whether Harold and Kathryn Black ("Debtors") may treat a claim of Conseco Finance Servicing Corporation ("Conseco") as unsecured or whether the claim is entitled to anti-modification protection pursuant to § 1322(b)(2) of the United States Bankruptcy Code. The Debtors have filed an objection to the claim of Conseco and a complaint to determine the validity, priority, and extent of Conseco's lien; Conseco has objected to confirmation of the Debtor's proposed plan. After a hearing on all matters on November 17, 2000, the Court took the case under advisement.

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) & (L) (1994), and the Court may enter a final judgment in the case. The following shall constitute find-

ings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The Debtors purchased a residence in Benton, Arkansas, in November 1997 for the sum of $92,000.00. The purchase was financed by a short term obligation that matured ("ballooned") in 2000 or 2001.

At some time not reflected by the record, the Debtors began experiencing financial difficulties. Regarding the refinancing of the residence, Mrs. Black testified that she replied to a television advertisement placed by Conseco. She stated that the Conseco agent whom she contacted advised that Conseco would lend up to 110% of the value of their residence.

As a result of her contact with Conseco, two notes and mortgages were executed by the Debtors. Dated October 15, 1999, the first note in the original principal sum of $112,100.00 is secured by a first mortgage granted to Conseco on the Debtors' personal residence. The note provides for monthly payments of principal and accrued interest in the sum of $1,172.38 per month for 240 months, beginning November 20, 1999. The interest rate is 11.20% per annum.

Dated October 19, 1999, the second note in the original principal sum of $17,700.00 is secured by a second mortgage granted to Conseco on the Debtors' personal residence. The note provides for monthly payments of principal and interest in the sum of $279.86 per month for 240 months beginning November 23, 1999. The interest rate is 18.49% per annum. Filed October 20, 1999, the second mortgage note states that the purpose of the loan is "debt consolidation." (Pl.'s Ex. 1.)

On June 14, 2000, Debtors filed a voluntary petition for relief under the provisions of Chapter 13 of the United States Bankruptcy Code. Among the assets scheduled was the Debtors' residence which they valued at $110,000.00. Conseco is scheduled as a creditor holding claims of $112,100.00 secured by a first mortgage on the residence and $17,700.00 secured by a second mortgage on the residence. Conseco filed a proof of claim asserting that as of the petition date, the amount owing on the first mortgage debt is the sum of $112,521.99, and a claim for an arrearage of $1,531.84, for a total claim of $114,053.83. Conseco filed a proof of claim on the second mortgage debt as a fully secured creditor for the sum of $18,080.63, and an arrearage of $437.84 due as of the petition date for a total claim of $18,518.47.

The Debtors' proposed chapter 13 plan provides that Conseco's claim secured by the first mortgage will be paid in full according to its terms outside the plan. Conseco's claim secured by the second mortgage is treated as a wholly unsecured claim and will receive only a pro-rata dividend along with other unsecured creditors.

On July 27, 2000, the Debtors filed adversary proceeding number AP 00–4103 against Conseco, alleging that Conseco's claim secured by the second mortgage is wholly unsecured pursuant to § 506(a) of the United States Bankruptcy Code. The Debtors contended that because of its unsecured status, the junior mortgage should be "stripped off . . . upon successful completion of the requirements of the plaintiffs' plan. . . ." (Complaint, July 27, 2000, at 2.) Subsequently, on August 30, 2000, the Debtors filed an objection to Conseco's claim of $18,080.63 as a secured claim. On September 12.2000, Conseco filed an objection to confirmation on the grounds that its claim of $18,080.63 should be treated as fully secured pursuant to § 1324[sic] of the United States Bankruptcy Code.

## FAIR MARKET VALUE OF
## THE RESIDENCE

■ The first issue to be determined is whether the second mortgage debt is partially secured by the supporting collateral or whether the claim is wholly undersecured.[1] To make this determination, the Court must assess the fair market value of the residence. Both parties introduced expert testimony concerning the issue.

The Debtors' expert appraiser testified that on November 2, 2000, the residence had a fair market value of $104,400.00. He stated that the residence consists of 1765 square feet of living space, has four bedrooms, two baths, and a swimming pool. The Debtors added the swimming pool and a sun room after the residence was purchased. The property is located in Benton, Arkansas, in the Misty Meadows area and is 24 years old. The appraiser noted that "subject property is in overall very good condition. Minor settlement cracks were noticed. Roof appears to be relatively new. Swimming pool has some major defects in structure and installation." (Debtors' Ex. 2.)

The appraiser's estimated value of $104,400.00 computes to an average value of 559.15 per square foot of living space and was based on three comparable sales of homes in the area. The appraiser adjusted the comparable sale price of the three homes upward or downward for comparison purposes to account for differences in the quality of the various properties. The sale of Comparable Number One, with 2000 square feet of living space, occurred October 16, 2000, for $93,000.00 or $46.50 a square foot. The sale of Comparable Number Two, which had 1665 square feet of living space, occurred August 24, 2000, for $102,500.00 or $61.56 a square foot. Comparable Number Three, with 1152 square feet of living space, was sold June 5, 2000, for $69,900.00 or $60.68 a square foot.

Utilizing the same comparable sales approach, Conseco's expert appraiser estimated the fair market value at $118,000.00 on October 6, 2000. The appraiser observed that "Subject is located in an area that enjoys average to good appeal and demand.... Property values in general in the area show a slight increase over the past year. However, the same statement may not apply to homes with swimming pools because there is insufficient sales data...." (Pl.'s Ex. 3.)

Conseco's appraiser computed an average price per square foot of living space of $64.17 compared with the Debtors' appraiser's estimate of $59.15. Comparable Number One had 1800 square feet of living space; the sale occurred October 6, 2000, for $130,000.00 or $72.22 per square foot. The sale of Comparable Number Two, with 1729 square feet of living space, occurred July 17, 2000, for a purchase price of $110,500.00 or $63.91 per square foot. Comparable Number Three, which had 1893 square feet of living space, sold March 28, 2000, for $137,000.00 or $72.70 per square foot.

One difference in the two appraisals is that the Debtors' appraiser measured the size of the dwelling at 1765 square feet while Conseco's appraiser measured 1839 square feet. The record does not indicate whether this difference is significant, and the Court has no way of knowing which is correct. Both appraisals are based on the comparable sales approach and the compa-

1. Courts use the term "wholly undersecured" to describe a secured claim with supporting collateral that "holds no remaining value after satisfaction of senior encumbrances." *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee)*, 212 F.3d 277, 280, n. 3 (5th Cir. 2000).

rable sales tend to support the value each appraiser assigned to the subject property.

Using the sales price per square foot of living space, the Court notes that the Debtors' estimate is $59.15 ($104,400 ÷ 1765 = $59.15) and Conseco's estimate is $64.17 ($118,000 ÷ 1839 = $64.17). Comparing the price per square foot demonstrates that the two appraisers do not differ substantially as to the fair market value of the residence. Both appraisers mentioned the swimming pool, which was added after the Debtors purchased the property, but neither appraisal indicated that the swimming pool added any significant value, presumably because of the "major" defects in the pool itself.

■ The Debtors purchased the subject property in November 1997 for $92,000.00, and the property was reappraised by the parties' experts in October and November of 2000. The price originally paid for the subject property is a very relevant factor in valuation if the sale occurred reasonably near the date upon which a subsequent valuation occurred. *See, e.g., In re Stauffer,* 141 B.R. 612, 614 (Bankr.N.D.Ohio 1992) (listing factors that can warrant adjustment in estimated value of collateral, including original purchase price) (citing *In re Folk,* 70 B.R. 13 (Bankr.S.D.Ohio 1986)); *Haas v. Martin (In re Martin),* 19 B.R. 496, 497 (Bankr.E.D.Pa.1982) (accepting appraisal of real estate because, among other reasons, the appraised value more closely approximated the previous sales price of the property one year earlier).

Conseco's appraiser mentioned that property values in the subject property neighborhood have gone up only slightly, and other than this testimony there is nothing in the record regarding trends in property value. Yet Conseco's appraisal of $118,000.00 represents a 22% increase over the purchase price in November 1997 of $92,000.00 which calculates to an aver-age monthly increase of approximately .06% per month or 7% per year. Such an increase would represent a substantial upward trend in property values which, if it did exist, should have been noticeable to both appraisers. The Debtors' appraisal represents a more modest increase in price and is consistent with Conseco's appraiser's observation regarding price increases in the previous 12 months. Therefore, the Debtor's appraisal appears to be the most reasonable of the two appraisals.

Recognizing that appraising real property is not an exact science, the Court will adjust the Debtors' appraisal 2% upward for a fair market value of $106,488.00 ($104,400.00 × .02 = $106,488.00). This figure includes an increase in value of $14,488.00 since the residence was purchased in 1997.

## ANTI–MODIFICATION PROTECTION

■ The determination that the value of the residence is $106,488.00 and that the residence is subject to Conseco's first mortgage of $114,053.00 raises the question whether Conseco's wholly undersecured claim of $18,571.00 secured by the second mortgage is a claim protected from modification by the Bankruptcy Code.

The facts in this case bring into play two sections of the Bankruptcy Code and create an issue that has been much litigated. Section 506 defines the existence and extent of a secured claim by measuring the value of the collateral supporting the lien. This section provides in relevant part that:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such

creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a) (1994).

In a chapter 13 case, the application of § 506 is subject to the provisions of § 1322(b)(2), which provides that a plan under chapter 13 may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ..." 11 U.S.C. § 1322(b)(2) (1994).

The Debtor here argues that the second mortgage debt can be modified because, under § 506(a), Conseco is not the holder of a secured claim supported by collateral with any remaining value after satisfaction of the first mortgage. The Debtor contends that because Conseco does not have a secured claim under § 506(a), the second mortgage debt is not protected from modification by § 1322(b)(2). Conseco argues that the United States Supreme Court's decision in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) prohibits any modification of the rights of the holder of a security interest in a debtor's personal residence.

In *Nobelman*, Justice Clarence Thomas observed that § 1322(b)(2) focuses on the rights of a holder of a secured claim secured by a security interest in the debtor's primary residence and not the claim itself. These rights, he reasoned, may not be modified, and the rights contained in the note and mortgage include "the right to repayment of the principal in monthly installments over a fixed term ... the right to retain a lien until the debt is paid off... and the right to bring an action to recover any deficiency remaining after foreclosure..." *Nobelman*, 508 U.S. at 329, 113 S.Ct. 2106.

However, Justice Thomas also pointed out that "[p]etitioners were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim." *Nobelman*, 508 U.S. at 328, 113 S.Ct. 2106. The Court in *Nobelman* proceeded to observe that the bank still held a partially secured claim, and, therefore, since it held a secured claim as defined by § 506, was entitled to the antimodification protection of § 1322(b)(2).

In interpreting *Nobelman*, the leading treatises on chapter 13 are split as to the question of whether the case stands for the proposition that a wholly undersecured claim like Conseco's is entitled to antimodification protection under § 1322(b)(2). The editors of Collier on Bankruptcy side with the Debtors' position:

> The *Nobelman* opinion strongly suggests, however, that if a lien is completely undersecured, there would be a different result. The opinion relies on the fact that, even after bifurcation, the creditor in the case was "still the 'holder' of a 'secured claim' because petitioners' home retain[ed] $23,000.00 of value as collateral." If the creditor had held a lien on property that had no value (perhaps because the property was fully encumbered by prior liens), then under this analysis, the creditor would not have been the "holder of a secured claim" entitled to protection by section 1322(b)(2).

5 Collier on Bankruptcy ¶ 132206[a][1] (Lawrence P. King et al. eds., 15th ed. rev.1999)

On the other hand, United States Bankruptcy Judge Keith Lundin argues in his chapter 13 treatise that

> Justice Thomas's analysis ties the protection from modification in § 1322(b)(2) to the existence of a "claim" secured by a lien on real property without regard to whether the claim holder would also

have an allowable secured claim after valuation and analysis under § 506(a). The clear implication of this analysis is that even a completely *unsecured* claim holder "secured" only by a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2), notwithstanding that such an "unsecured" lien holder could not have an allowable secured claim under § 506(a).... In other words, the trigger for Justice Thomas's protection of rights analysis is the existence of a lien, not the presence of value to support that lien.

1 Keith M. Lundin, Chapter 13 Bankruptcy § 4.46, at 4–56 (2nd ed.1994).

Some courts have adopted Conseco's view, but the majority view favors the Debtors' interpretation. *See, Bartee v. Tara Colony Homeowners Association (In re Bartee)*, 212 F.3d 277, 289, nn. 15, 16 (5th Cir.2000) (gathering cases demonstrating split in authority and articulating majority view that wholly undersecured claims are not entitled to anti-modification protection).

The three Circuit Courts of Appeals considering the question have permitted modification of a claim secured by a junior lien hat is wholly undersecured under the definition of a secured claim provided by § 506. *In re Bartee*, 212 F.3d at 291 (wholly undersecured junior lien in debtors' principal residence not protected); *McDonald v. Master Fin., Inc. (In re McDonald)*, 205 F.3d 606, 615 (3d Cir.2000) (same), *cert. denied*, —— U.S. ——, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000); *American Gen. Fin., Inc. v. Dickerson (In re Dickerson)*, 222 F.3d 924, 926 (11th Cir.2000) (denying anti-modification protection to wholly undersecured junior mortgage based on precedent but noting that the rule overemphasizes imprecise valuation

process), *cert. denied*, —— U.S. ——, 121 S.Ct. 1604, 149 L.Ed.2d 470 (2001).

The Bankruptcy Appellate Panels for the First and Ninth Circuit Court of Appeals also agree with the majority view. *Domestic Bank v. Mann (In re Mann)*, 249 B.R. 831, 840 (1st Cir. BAP 2000); *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36,41 (9th Cir. BAP 1997), *appeal dismissed*, 192 F.3d 1309 (9th Cir.1999).

The majority of Bankruptcy Courts in the Eighth Circuit considering this issue have sided with the Debtors' argument that the creditor's claim can be modified if it is wholly undersecured. *McCarron v. FirstPlus Fin. (In re McCarron)*, 242 B.R. 479, 483–84 (Bankr.W.D.Mo.2000) (Venters, J.); *In re Sanders*, 202 B.R. 986, 991 (Bankr.D.Neb.1996) (Mahoney, J.); *In re Mitchell*, 177 B.R. 900, 902 (Bankr. E.D.Mo.1994) (Schermer, J.); *In re Kaczmarczyk*, 107 B.R. 200, 204 (Bankr. D.Neb.1989) (Minahan, J.).

In defending the majority view, Judge Mahoney adopted the reasoning that the term "secured claim" can be interpreted in two different ways:

Perhaps the best analysis of this issue in a post-*Nobelman* case was provided by *In re Hornes*, 160 B.R. at 709. In that case, the court found that the term "secured claim" con be construed in two ways. First, it may be interpreted in the literal sense, that is, a claim that is secured by a lien on collateral. Second, it may be interpreted in the "code" sense, that is, a claim is secured to the extent that there exists some equity in the collateral that secures the claim. *Id.* at 711–12. The court went on to find that the "other than ..." clause of § 1322(b)(2), as held by *Nobelman*, refers to a secured claim in the literal sense, but that the term "secured claim" in the preceding clause refers to a secured claim in the "code" sense, and that

a creditor must hold a secured claim in both the literal and code senses in order to come within the anti-modification provision of § 1322(b)(2). *Id.* at 712.

Although the Court in *Nobelman* held that the term "claim" in the "other than . . ." clause does not refer back to the term "secured claim" in the preceding clause.

> *Nobelman* did not hold that the other than clause applies to the rights of holders described in the secured claims clause that precedes it, that is holders of secured claims in the code sense; indeed that issue was not before the court. The Court simply held that the word "claim" in the other than clause stands by itself, and is not implicitly modified by the word "secured" appearing in the secured claims clause. It is therefore consistent with *Nobelman* . . . to hold that even though [the creditor's] claim is literally within the language of the other than clause, since it holds only a totally unsecured claim in the code sense, § 1322(b)(2) does not protect its rights.

*In re Sanders*, 202 B.R. 986, 988 (Bankr. D.Neb.1996) (quoting *In re Hornes*, 160 B.R. 709, 714 (Bankr.D.Conn.1993)).

On the other hand, at least two bankruptcy courts in the Eighth Circuit support the minority view. *See, e.g., In re Henline*, 242 B.R. 459, 464 (Bankr.D.Minn. 1999) (O'Brien, J.); *In re Mattson*, 210 B.R. 157, 158 (Bankr.D.Minn.1997) (Kressell, J.); *In re Hussman*, 133 B.R. 490, 493 (Bankr.D.Minn.1991) (Kressell, J.)

In Judge Kressell's view, determining the amount of the secured claim under § 506(a) is irrelevant when dealing with a home mortgage under § 1322(b)(2) because the latter provision focuses on the type of claim the creditor holds rather than the amount of the secured claim.

Judge Kressell cites with approval the observation of the Fifth Circuit Court of Appeals that the legislative history indicated:

> With regard to § 1322(b)(2), the Senate receded from its position that no "modification" was to be permitted of *any* mortgage secured by real estate; it instead agreed to a provision that modification was to be barred *only* as to a claim "secured only by a security interest in real property *that is the debtor's principal residence.*"

*In re Hussman* 133 B.R. 490, 493 (Bankr. D.Minn.1991) (quoting *Grubbs v. Houston First Am. Savs. Ass'n*, 730 F.2d 236, 246 (5th Cir.1984)).

The opinion of Judge Kressell and Judge Lundin are not to be disregarded lightly; however, this Court is persuaded that the majority view is better reasoned. As pointed out by several courts, the United States Supreme Court in *Nobelman* appeared to sanction resort to § 506 to determine if a creditor, in fact, holds a secured claim. Defining a secured claim by examining whether any value in property exists to support the lien rights is consistent with economic reality and just makes good sense. For example, the wholly undersecured creditor who holds a valid second mortgage receives nothing in a foreclosure sale and has only nominal economic rights in the collateral.

Also, the same policy reasons Congress recognized in extending anti-modification protection to lenders who furnish purchase money for home purchasers do not exist for lenders who make loans secured with second mortgage liens. *In re Bartee*, 212 F.3d at 292–93 (quoting *In re McDonald*, 205 F.3d at 613; *In re Lam*, 211 B.R. at 41). Frequently, so called "second mortgage loans" or "aluminum siding loans" are made in the sub-par market to low income households. These loans sometimes bear

unconscionably high interest rates,[2] and many are the result of predatory lending practices involving a segment of our public that cannot obtain more conventional credit because they are not credit worthy. *See,* Jane Kaufman Winn, *Lien Stripping After Nobelman,* 27 Loy.L.A.L.Rev. 541, 584 & n. 240 (1994).

The Fifth Circuit Court of Appeals quoted with approval the observation of one commentator who explained the policy considerations supporting denial of anti-modification protection to certain junior lien holders:

> In addition, several other policy justifications support denying antimodification protection to junior lienors. One has to do with predatory lending practices prevalent in communities that have traditionally been denied access to finance on conventional terms. Although the practice of granting home equity loans to permit homeowners to cash out their equity in houses that may have appreciated substantially since purchase may not raise significant policy issues in many instances, a real problem arises when low-income households—in which home equity may be the only significant asset—are pressured into granting multiple liens on their homesteads by unscrupulous lenders. Predatory lenders may target members of [these low-income] communities threatened with foreclosure by refinancing their debt at astronomical interest rates. The ability of such junior lienors to hide behind the antimodification provision of § 1322(b)(2) is particularly offensive to public policy.

*In re Bartee,* 212 F.3d at 293 (quoting Jane Winn Kaufman, *Lien Stripping After Nobelman,* 27 Loy.L.A.L.Rev. 541, 584 (1994)).

Therefore, for the reasons stated, the Debtors' plan properly treats the wholly undersecured claim of Conseco as unsecured. The Court finds in favor of the Debtors with regard to the adversary proceeding, sustains the Debtors' objection to the claim of Conseco, and overrules Conseco's objection to confirmation.

IT IS SO ORDERED.

---

**2.** The interest rate on Conseco's second mortgage note was 18.49% for 20 years.