**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 99-20463

---

In The Matter Of:

**RONALD BARTEE,**

Debtor.

_____

**RONALD BARTEE,**

Appellant,

V.

**TARA COLONY HOMEOWNERS ASSOCIATION and**
**DANIEL E. O'CONNELL,**

Appellees.

---

Appeal from the United States District Court
for the Southern District of Texas

---

May 15, 2000

Before HIGGINBOTHAM and PARKER, Circuit Judges; and ATLAS, District

Judge.[1]

---

[1] District Judge of the Southern District of Texas, sitting
by designation.

ROBERT M. PARKER, Circuit Judge:

Appellant Ronald Bartee ("Debtor") seeks review of an order sustaining the objection of Appellee Tara Colony Homeowners Association ("Creditor") to his proposed Chapter 13 Plan (the "Plan"). Under the Plan, Debtor moved to "cramdown"[2] Creditor's claim that is secured by a subordinate lien on Debtor's principal residence. Debtor argues that since no equity exists in the residence after satisfaction of the senior mortgage, pursuant to the valuation and classification provisions of Bankruptcy Code § 506, Creditor holds only an unsecured claim. Consequently, without a secured claim, Creditor cannot benefit from the antimodification provisions of § 1322(b)(2) that protect holders of allowed secured claims secured by a debtor's principal residence. Creditor argues that the Supreme Court's decision in *Nobelman v. American Savings Bank,* 508 U.S. 324 (1993), which interpreted § 1322(b)(2) as prohibiting the cramdown of under-secured liens, should be extended to protect junior liens that are wholly unsecured by any

---

[2] "'Cramdown' is a term of art used to refer to the bifurcation of a claim into secured and unsecured portions pursuant to 11 U.S.C. § 506. Title 11 U.S.C. § 1325(a)(5) allows a Chapter 13 debtor to reduce or eliminate the unsecured portion of the claim." *In re Perry*, 235 B.R. 603, 605 n.1 (S.D. Tex. 1999). In effect, the secured creditor's claim is limited to the market value of the collateral to which the lien is attached. *See Lomas Mortgage, Inc. v. Louis*, 82 F.3d 1, 1 n.1 (1st Cir. 1996). "When a claim is crammed down to zero, this is referred to as 'strip off' of a claim." *In re Perry*, 235 B.R. at 605 n.1.

2

corresponding value in the collateral residence.[3]

Debtor advances a second line of argument based on § 1322(c)(2)(1994), an exception to § 1322(b)(2) which permits modification of short-term mortgages under which the final payment comes due during the life of the proposed plan. According to Debtor, § 1322(c)(2) provides an independent basis for cramdown of the claim, because the single payment due on this annual assessment came due during the course of the proposed plan.

The bankruptcy court and the district court rejected both of Debtor's arguments; we agree solely with his first. We hold that (1) the Bankruptcy Code's antimodfication provisions do not protect secondary lienholders whose interest is not supported by at least some value in the debtor's principal residence, and (2) the narrow exception to the antimodification provisions intended to cover short-term mortgages does not apply to secondary liens for annual assessments. AFFIRMED IN PART, REVERSED IN PART and REMANDED.

## I. FACTS AND PROCEEDINGS BELOW

---

[3] In Bankruptcy Code parlance an "undersecured" claim is one supported by collateral valued at less than the amount of the claim. A "wholly undersecured" claim is one for which the supporting collateral holds no remaining value after satisfaction of senior encumbrances. It should be noted that some courts refer to wholly undersecured claims as simply "unsecured" claims. Although a wholly undersecured claim is actually "secured" by a lien, it may still be considered "unsecured" for the purposes of § 1322(b)(2)'s antimodification provision if it is completely without supporting collateral value. In order to avoid as much confusion as possible, we will employ the term "wholly undersecured" throughout this opinion.

The parties to this appeal submitted the case to the bankruptcy court upon a stipulated record. The record reflects that on March 12, 1998, Ronald Bartee filed a Chapter 13 bankruptcy case including as property of the estate his principal residence, a home situated on a lot in Tara Colony subdivision, Richmond, Texas. Ocwen Federal Bank, FSB holds a first lien mortgage on the real property and an allowed secured claim in the amount of $88,840.23. As of the proposed effective date of the Plan, Debtor's homestead was valued at only $87,000.

A second claim, secured only by a lien against Debtor's principal residence, was filed by Tara Colony Homeowners Association in the amount of $1,096.62. This subordinate claim is for a pre-petition annual assessment imposed pursuant to subdivision covenants and deed restrictions. These covenants and restrictions provide that each lot within Tara Colony is subject to an annual maintenance assessment; that each homeowner is deemed to agree to pay this assessment when he accepts the deed for the lot; that the assessments, together with interest, costs, and reasonable attorney's fees, would be a continuing lien on the property; and that the assessments would come due on January 1, of the specific year for the preceding year.[4] The payment at issue came due on

---

[4] On December 9, 1983, General Homes Corporation filed with the Fort Bend County Clerk a "Declaration of Covenants, Conditions and Restrictions." Article V of the filed Declaration provides for the creation of the Tara Colony Homeowner's Association. Article VI, Sec. 1 provides for maintenance assessments and the creation of a lien for assessments. "Each Lot in the Properties is hereby

January 1, 1998.

On August 19, 1998, Debtor filed his First Amended Chapter 13 Plan and served all creditors and parties-in-interest. All conditions and requirements for confirmation of the Plan were met save only the issue of the treatment of Tara Colony's claim. The Plan called for the cramdown of the subordinate lien, treating the entire claim as a general unsecured claim. Although, as an unsecured creditor, Tara Colony would not receive any disbursements on its claim for the delinquent assessment payment, Tara Colony's lien is to be retained.

Tara Colony filed an objection to the Plan; Bartee responded with an objection to the Tara Colony claim. Daniel E. O'Connell, the Chapter 13 Trustee, appearing as an interested party, opposed confirmation of the Plan. Following a contested hearing on the objections, the bankruptcy court allowed the secured claim and denied confirmation of the Plan.

---

subjected to an annual maintenance charge, . . . and each Owner of any Lot by acceptance of a deed therefore . . . is deemed to covenant and agree to pay to the Association: (1) annual assessments or charges, and (2) special assessments for capital improvements . . . . The annual and special assessments, together with interests, costs, and reasonable attorney's fees, shall be a charge on the Lot and shall be a continuing lien upon the property against which each such assessment is made." Art. VI, Sec. 6 provides for the subordination of the lien to perfected mortgages. Art. VI, Sec. 5 specifically grants Tara Colony the right to foreclose. "Any assessment not paid within thirty (30) days after the due date shall bear interest from the date at the rate of six (6%) percent per annum. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien against the property."

Bartee appealed to District Court for the Southern District of Texas. The district court affirmed the bankruptcy court's ruling and dismissed the appeal with prejudice. This appeal followed.

## II. JURISDICTION

Before considering the substantive issues now before us, we must first address the question of our jurisdiction over this appeal. Counsel were instructed to brief the question of "[w]hether the order entered [by the bankruptcy court] is a final decision, appealable within the meaning of 28 U.S.C. § 158(d), or whether there is some other basis for appellate jurisdiction." All three parties to this appeal contend that this Court may properly exercise its appellate jurisdiction, invoking the grant of jurisdiction in § 158(d). We agree.

The jurisdiction of this Court to hear bankruptcy appeals is conferred by 28 U.S.C. § 158(d)(1994) and 28 U.S.C. §§ 1291 & 1292 (1994). Since this case does not involve interlocutory orders, injunctions, or any other orders specified in § 1292, we have jurisdiction over this case only to the extent that the judgments below are considered "final" within the meaning of § 158(d) or § 1291.[5] Because "finality" for the purposes of bankruptcy appeals

---

[5] *See* 28 U.S.C. § 158(d)("The courts of appeal shall have jurisdiction of appeals from all final decisions, judgments, orders and decrees . . ." entered by the district courts hearing bankruptcy appeals.); 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . .").

6

under § 158(d) is considered more liberally or flexibly than "finality" under § 1291, we address the appealability of the denial of confirmation order in this case solely under the less stringent standard of § 158(d). *See Internal Revenue Serv. v. Orr (In re Orr)*, 180 F.3d 656, 659 (5th Cir. 1999)("There is [] a lower threshold for meeting the 'final judgments, orders, and decrees' appealability standard under 28 U.S.C. § 158(d) than there is for the textually similar 'final decisions' appealability standard under 28 U.S.C. § 1291.").

This circuit has long rejected adoption of a rigid rule that a bankruptcy case can only "be appealed as a 'single judicial unit' at the end of the entire bankruptcy proceeding." *Orr*, 180 F.3d at 659 (quoting *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.*), 844 F.2d 1142, 1155 (5th Cir. 1988)).[6] Instead,

---

[6] Two circuit courts of appeal favor a rigid rule of finality. Such a rule is undesirable primarily because it is fraught with unintended inefficiencies -- such as the necessity of making serial filings or involuntary proposed plans -- and other appellate pitfalls. *See, e.g., Simons v. Federal Deposit Ins. Corp. (In re Simons)*, 908 F.2d 643 (10th Cir. 1990); *Maiorino v. Branford Savings Bank*, 691 F.2d 89 (2d Cir. 1982). The defects of a rigid rule, when applied to the denial of a confirmation of Chapter 13 plan, were set forth in Judge Lumbard's dissenting opinion in *Maiorino*:

> The procedural holding adopted by the majority may have serious substantive consequences. Only the debtor may propose a Chapter 13 plan. Therefore the debtor is always the party who seeks to confirm a plan; the creditor is always the party who seeks to deny confirmation. *The effect of today's holding is that when creditors lose and a plan is confirmed, creditors may appeal immediately as of right; when debtors lose and a*

7

an appealed bankruptcy order must constitute either a "final determination of the rights of the parties to secure the relief they seek," or a final disposition "of a discrete dispute within the larger bankruptcy case for the order to be considered final." *Orr*, 180 F.3d at 659 (quoting *In re Texas Extrusion Corp.*, 844 F.2d at 1155). We recently explained the utility of our flexible rule of finality:

> [A] determination that appellate jurisdiction arises only when the bankruptcy judge enters an order which ends the entire bankruptcy case, leaving nothing for the court to do but execute the judgment, would substantially frustrate the bankruptcy system. This is so particularly when, as here, one independent decision materially affects the rest of the bankruptcy proceedings. Separate and discrete orders in many bankruptcy proceedings determine the extent of the bankruptcy estate and influence creditors to expend or not to expend effort to recover monies due them. The reversal of such an order would waste exorbitant amounts of time, money, and labor and would likely require parties to start the entire bankruptcy process anew. This potential waste of judicial and other resources has influenced this Court and other courts of appeals to view finality in bankruptcy proceedings in a more practical and less technical light.

---

> *plan is rejected, they may appeal only by leave of the district court.* Their only alternative is to wait until a less favorable plan is confirmed, which may be months away, or until the bankruptcy court dismisses the case or dissolves the automatic stay, which the debtors will try to postpone for as long as possible. In either event, a bankruptcy court ruling which is final as to a plan of arrangement will be reviewable long after it is made, perhaps long after the plan can be revived. *Congress enacted Chapter 13 to aid consumer debtors; we should not delay their access to relief on appeal.*

*Maiorino*, 691 F.2d at 95 (Lumbard, J., dissenting)(emphasis added).

8

*England v. Federal Deposit Ins. Corp.* (*In re England*), 975 F.2d 1168, 1171 (5th Cir. 1992).

Recognition that the denial of a Chapter 13 plan can be a final order is all but compelled by considerations of practicality. Often an appeal is the only reasonable course, since the debtor is left without any real options in formulating his plan. In the instant case, under the bankruptcy court's ruling, Debtor cannot modify Tara Colony's claim, he therefore lacks any alternative if the plan is to address the assessment claim. If an appeal is impermissible, Debtor must choose between filing an unwanted or involuntary plan and then appealing his own plan, or dismissing his case and then appealing his own dismissal.

Under our flexible rule of finality, we have, on numerous occasions, addressed the merits of appeals from the denial of confirmation of Chapter 13 plans. *See, e.g.*, *Williams v. Tower Loan of Mississippi, Inc.* (*In re Williams*), 168 F.3d 845 (5th Cir. 1999); *O'Connell v. Troy & Nichols, Inc.* (*In re Cabrera*), 99 F.3d 684 (5th Cir. 1996); *Grubbs v. Houston First American Savings Assoc.* (*In re Grubbs*), 730 F.2d 236 (5th Cir. 1984) (*en banc*); *Foster v. Heitkamp* (*In re Foster*), 670 F.2d 478 (5th Cir. 1982). In fact our decision in *Nobleman v. American Savings Bank* (*In re Nobleman*), 968 F.2d 483 (1992),[7] *aff'd*, *Nobelman v. American*

---

[7] The correct spelling of the debtors' surname is "Nobelman," however, the title of the case was misspelled when docketed. In an effort to maintain harmony with the Clerk's Office, we retained the

9

*Savings Bank*, 508 U.S. 324 (1993), involved the denial of confirmation of a Chapter 13 plan.[8]

In the case of a denial of confirmation of a plan, we look to whether or not the order was intended to serve as a final denial of the relief sought by the debtor. If the order was not intended to be final -- for example, if the order addressed an issue that left the debtor able to file an amended plan (basically to try again) -- appellate jurisdiction would be lacking. *See Orr*, 180 F.3d at 659.

The character of the bankruptcy court's order demonstrates that the court was aware that policy and practicality counseled against retaining jurisdiction over the case. The bankruptcy court's order, in which it denied confirmation of the proposed plan and denied Debtor's objection to the disputed claim, was styled "Final Order." This order conclusively determined the substantive rights at issue and ended the dispute. The record does not contain any indication that the bankruptcy court intended to take any further action on the objection to the claim or the objection to confirmation, and no party to this action argues that any further

---

incorrect spelling in our opinion. The Supreme Court did not feel similarly constrained, accordingly, they used the correct spelling.

[8] The parties note that we held jurisdiction to be proper in several analogous bankruptcy cases. *See Moody v. Empire Life Ins. Co. (In re Moody)*, 849 F.2d 902, 904 (5th Cir. 1988) (order allowing a claim or priority in a bankruptcy proceeding which determines the amount due a creditor is appealable); *In re Lift & Equip. Serv., Inc.*, 816 F.2d 1013, 1015 (5th Cir. 1987) (recognition of a creditor's security interest is a final order).

action was to take place.  The district court entered a Memorandum and Opinion affirming the bankruptcy court's ruling and dismissed the appeal with prejudice.  Thus, while the labeling of the judgments below is not determinative, the courts' characterization of their orders as final and their apparent decision not to take further action all support the conclusion reached by all parties to this appeal, namely that the bankruptcy court's order was final. Accordingly, we believe jurisdiction to be proper.

### III.  DISCUSSION

#### A.  Standard of Review

Since there are no contested issues of fact in this appeal, we are presented solely with questions of law.  We review a Bankruptcy court's legal rulings *de novo*.  *See Traina v. Whitney National Bank*, 109 F.3d 244, 246 (5th Cir. 1997).

#### B.  § 1322(b)(2)

##### *1.  The Nature of the Tara Colony Claim*

Under Texas state law, a homeowners association's claim on an unpaid maintenance assessment is secured by a lien running with the land giving the association the right to foreclose on the residence to enforce unpaid maintenance fees or other costs.  *See Inwood North Homeowner's Assoc., Inc. v. Harris*, 736 S.W.2d 632, 635-36 (Tex. 1987).  "A restrictive covenant that touches and concerns the land is binding on subsequent purchasers of the property."  *In re Perry*, 235 B.R. 603, 605 (S.D. Tex. 1999)(citing *Inwood*, 736 S.W.2d

11

at 635.). The Tara Colony lien is a binding subordinate security interest in the debtor's primary residence.

### 2. The Governing Bankruptcy Code Sections

Bartee seeks to reorganize his debts under Chapter 13 of the Bankruptcy Code. Chapter 13 was designed to facilitate the adjustment of the debts of individuals whose regular income allows them to fund a flexible repayment plan. *See* LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY § 1322.01 (15th ed. 1999) (hereinafter "COLLIER ON BANKRUPTCY"). The great benefit to a Chapter 13 bankruptcy is that a debtor can preserve existing assets, all the while granting creditors a ratable recovery from future income unavailable under Chapter 7 liquidation. *See Foster v. Heitkamp (In re Foster)*, 670 F.2d 478, 483 (5th Cir. 1982); *Kitchens v. Georgia Railroad Bank and Trust Co.*, 702 F.2d 885, 887 (11th Cir. 1983). Following the completion of all payments specified under the plan, the debtor is granted a liberal discharge. *See id.; see also* 11 U.S.C. § 1328. With these benefits in mind, "courts have repeatedly emphasized Congress's preference that individual debtors use Chapter 13 instead of Chapter 7." *In re McDonald*, 205 F.3d 606, 614 (3d Cir. 2000).

The resolution of this case rests upon the interaction of two sections of the Bankruptcy Code as applied to a junior lien unsecured by any supporting value in the collateral home. The first, § 506(a), describes the extent to which an allowed claim is

12

to be treated as a secured claim for purposes of the Code, as well as how a secured claim is to be valued. *See* COLLIER ON BANKRUPTCY § 506.01. Essentially, this valuation provision acts as a "sorter" of claims; claims are categorized as either secured or unsecured depending on the value of the supporting collateral. See COLLIER ON BANKRUPTCY § 506.03. The relevant portion of section 506(a) reads:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.

11 U.S.C. § 506(a)(1994); *see United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 239 (1989)(under § 506(a), "a claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured").

A Chapter 13 plan may modify the rights of creditors holding secured claims; the extent to which the plan may modify these rights and still be confirmed by the bankruptcy court depends upon the application of § 1325(a)(5).[9] *See In re Young*, 199 B.R. 643,

---

[9] § 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if--
....
(5) with respect to each allowed secured claim provided for by the plan--

13

647 (Bankr. E.D. Tenn. 1996)("The very essence of a § 1325(a)(5) modification is the write down or 'cramdown' of a secured claim to the value of the collateral securing the debt."). The exception to this rule is contained in the second Code section at issue, § 1322(b)(2), which prohibits the modification of the rights of the holder of a claim secured only by a security interest in a debtor's principal residence. *See Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 38 (B.A.P. 9th Cir. 1997). In relevant part, § 1322(b)(2) provides:

> (b) Subject to subsections (a) and (c) of this section, the plan may--
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

11 U.S.C. § 1322(b)(2)(1994).

    3. Nobelman *Resolves an Earlier Split in Authority*

The Supreme Court addressed the interplay of § 506(a) and § 1322(b)(2) as applied to an undersecured first lienholder, in

---

> (A) the holder of such claim has accepted the plan;
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>   (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
> (C) the debtor surrenders the property securing such claim to such holder...

11 U.S.C. § 1325(a)(5)(1994).

14

*Nobelman v. American Savings Bank*, 508 U.S. 324 (1993). Prior to Nobelman, all four circuit courts of appeal that had addressed the interaction of these provisions concluded that a Chapter 13 debtor could use § 506(a) to ascertain what portion of the mortgage was supported by collateral value in the homestead. The debtor could then bifurcate the mortgage into secured and unsecured portions, of which only the secured portion would be shielded from modification by § 1322(b)(2).[10]

When the issue was first presented to this court, we rejected our sister courts' reasoning. *See In re Nobleman*, 968 F.2d 483 (5th Cir. 1992).[11] Our nonconformist decision created a circuit split, prompting the Supreme Court to grant certiorari. Justice Thomas, writing for a unanimous court, employed an analysis more akin to that of our sister courts, only to disagree with their conclusion. Unfortunately, Justice Thomas's efforts to harmonize these two statutory provisions created some confusion among the lower courts; the perceived ambiguity in the opinion is the root cause of the current split of authority on the issue now before us.

---

[10] *See, e.g., In re Bellamy*, 962 F.2d 176 (2d Cir. 1992); *In re Hart*, 923 F.2d 1410 (10th Cir. 1991); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3d Cir. 1990); *In re Hougland*, 886 F.2d 1182 (9th Cir. 1989).

[11] The Nobelmans submitted a Chapter 13 plan that valued their principal residence, encumbered by a mortgage for $65,250, at only $23,500. Under their proposed plan, the Nobelmans sought to pay only the latter amount as a secured claim and treat the remaining balance as an unsecured claim for which the mortgagee was to receive nothing.

*See, e.g.*, *In re Lam*, 211 B.R. at 42 (holding that § 1322(b)(2) *does not* protect a wholly undersecured lienholder); *In re Perry*, 235 B.R. 603, 607-08 (S.D. Tex. 1999) (holding that § 1322(b)(2) *does* protect a wholly undersecured lienholder).

Although the Justices affirmed the result we had reached in Nobleman, they disagreed with our analysis. First, we concluded that § 506(a) and § 1322(b)(2) were in conflict. *See In re Nobleman*, 968 F.2d 483, 489 (5th Cir. 1992)("The bifurcation of an undersecured home mortgage runs afoul of the specific protection afforded under section 1322(b)(2) to home mortgage creditors whose claims are secured only by a debtor's principal residence."). Second, we concluded that § 1322(b)(2) trumped § 506(a). *See id.* The Supreme Court rejected our reasoning that § 506(a) was rendered a nullity by § 1322(b)(2), but nevertheless, agreed with the end result -- namely, that § 1322(b)(2)'s antimodification provision protected the entire mortgage.[12]

Justice Thomas began his opinion by confirming that § 506(a) is the starting point in the analysis and is not rendered a nullity in the Chapter 13 context. *See id.* at 328 ("[Debtors] were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim.") Furthermore, debtors could "seek a valuation in proposing their

---

[12] As we turn to discuss the current split in authority, our rejected analysis should be kept in mind, as it bears a striking resemblance to the analysis urged by Tara Colony in this case.

16

Chapter 13 plan," and it would be this "judicial valuation of the collateral [that would] determine the status of the [creditor's] secured claim." *Id.* at 328. Nevertheless, the Court ultimately held that

> to give effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan in the manner the [debtors] propose would require a modification of the rights of the holder of the security interest. Section 1322(b)(2) prohibits such a modification where, as here, the lender's claim is secured only by a lien on the debtor's principal residence.

*Id.* at 331. Thus, under the plain language of § 1322(b)(2), a debtor is prevented from using § 506(a) to bifurcate a claim secured only by a lien on the debtor's principal residence. "The court's rationale for this holding was that the secured and unsecured components arose out of the same loan documents that gave the bank its rights and, therefore, the debtors could not 'modify the payment and interest terms for the unsecured component . . . without also modifying the terms of the secured component.'" *In re Baez*, 244 B.R. 480, 483 (Bankr. S.D. Fla. 2000). A key element to this conclusion was the fact that, even after the operation of § 506(a), the mortgage holder was "still the 'holder' of a 'secured claim,' because [the debtors'] home retain[ed] $23,500 of value as collateral." *Nobelman*, 508 U.S. at 329. As the holder of a secured claim, the mortgage holder's "rights" could not be modified.

But what exactly are these "rights?" Since the Bankruptcy

17

Code offers no definition, Justice Thomas reasoned that Congress must have intended the state law definition to govern. These unmodifiable rights were deemed to include the right to receive monthly payments, to "proceed against the [debtor's] residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Id.* at 329. Similarly, one would expect the right of a junior mortgagee to advance funds to a senior mortgagee, insurer or tax collector to protect its collateral to be similarly protected. *See In re Baez*, 244 B.R. at 484. Justice Thomas concluded his rights analysis with an admonition that *Nobelman* should not be read as holding that a home mortgage holder's rights are completely "unaffected" by a Bankruptcy. By example, Justice Thomas referenced a creditor's right of foreclosure in the event of default, a right that is "checked by the Bankruptcy Code's automatic stay provision." *See Nobleman*, 508 U.S. at 330.

Having explained that a debtor can opt for a valuation pursuant to § 506(a), and having defined the "rights" that a holder of a secured claim can enjoy without risk of modification, Justice Thomas turned to the final step in the discussion, explaining exactly what constitutes a "secured claim." Our sister courts had concluded that § 1322(b)(2)'s antimodification clause applied only to that portion of a creditor's claim that was still considered secured after operation of § 506(a). These courts, applying the

18

rule of the last antecedent, determined that the clause "other than a claim secured only by a security interest in . . . the debtor's principal residence," modified the antecedent immediately preceding it -- "secured claims."[13]  If the modifying clause applied only to the term "secured claims," then it was reasoned, the antimodification provision was only implicated by that part of the mortgage that was supported by collateral value in the home as determined by § 506(a).

Justice Thomas characterized this reasoning as "sensible as a matter of grammar" but "not compelled." *Nobelman*, 324 U.S. at 330. Instead, Justice Thomas explained that Congress consciously chose the unqualified term "claim" rather than the term of art "secured claim" when crafting the antimodification provision.  Because "claim" is broadly defined under the Bankruptcy Code, the conclusion to be drawn from its use is clear.  Essentially, Congress employed the broader term specifically to capture the entire claim -- including both its secured and unsecured portions -- put forward by the bank.  It is this expansive reading of the term "claim" in § 1322(b)(2)'s antimodification clause which has caused the confusion in the lower courts.  Specifically, some

---

[13]  The exact language at issue states that the debtor's plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence. . . ."

11 U.S.C. § 1322(b)(2)(1994).

courts have continued to see a tension between § 506(a) and § 1322(b)(2) when applied to wholly undersecured junior liens or mortgages. *See In re Robinson*, 231 B.R. 30, 33 (Bankr. D. N.J. 1997) ("creditor's rights under § 1322(b)(2) may not be modified . . . and there is no right to look to § 506(a) for valuation").

### 4. Contentions of the Parties

Debtor contends this case is resolved by § 506(a) alone. He argues that in light of *Nobelman*, he is clearly prevented from bifurcating and stripping down the purchase money first lien on the residence. Debtor opted for a valuation of the residence, pursuant to § 506(a), which resulted in an estimated market value of $87,000. Although the first lien is slightly undersecured, Ocwen Federal is still the holder of a secured claim, and therefore, can fully rely upon § 1322(b)(2) to preclude modification of its lien.

Debtor argues that it is equally clear that the junior lien can be modified without offense to § 1322(b)(2). The valuation exposed the second lien as wholly without any supporting collateral value in the home. According to Debtor, under the plain language of § 1322(b)(2), Tara Colony is not the holder of an allowed secured claim, thus its claim is unprotected by § 1322(b)(2) and is subject to cramdown.

Creditor's contrary argument is based on a determination that the emphasis in the *Nobleman* decision was on the "rights" of creditors rather than value of the claims. Purportedly, the

20

critical point is not the classification of a claim as either secured or unsecured, but rather the fact that the creditor holds a lien on the residence. *See, e.g.*, *American Gen. Fin. v. Dickerson*, 229 B.R. 539, 542 (M.D. Ga. 1999). Creditor emphasizes Justice Thomas's statement in *Nobelman* that the position taken by the debtors "fail[ed] to take adequate account of § 1322(b)(2)'s focus on 'rights.'" *Nobelman*, 508 U.S. at 328. It is argued that just as the *Nobelman* Court sought to protect the rights of under-secured creditors, we must similarly protect the rights of wholly undersecured creditors.

In support of its position, Creditor points to the manner in which § 1322(b)(2) was drafted. Specifically, Congress chose to use the phrase "claim secured . . . by" rather than the term of art "secured claim." Under this line of reasoning, "secured claim" is a subset of the broader "claims secured by" -- in this case a lien. Therefore the nature of the claim can be determined solely by ascertaining whether the claim is secured by a lien; any contrary result reached through the valuation and claim determination scheme of § 506(a) can be disregarded.[14]

---

[14]   Creditor emphasizes the following passage in *Nobleman* stated:

> But even if we accept petitioners' valuation, the bank is still the "holder" of a "secured claim," because petitioners' home retains $23,500 of value as collateral. The portion of the bank's claim that exceeds $23,500 is an "unsecured claim componen[t]" under § 506(a); **however, that determination does not necessarily mean that the**

21

*5.  The New Split in Authority*

The different positions staked out by the parties reflect a substantial split of authority among the courts that have addressed § 1322(b)(2)'s applicability to a wholly undersecured second mortgage or lien.  Until very recently, the only appellate court to address the issue was the bankruptcy appellate panel of the Ninth Circuit.  *See In re Lam*, 211 B.R. 36 (B.A.P. 9th Cir. 1997).  The Ninth Circuit bankruptcy panel agreed with the majority of courts that the antimodification provision of § 1322(b)(2) does not apply to a wholly unsecured second lien.  *See id.* at 41.  As we began drafting this opinion, the Third Circuit handed down a like-minded opinion, reversing a district court that had expressly adopted the minority view.  *See In re McDonald*, 205 F.3d 606 (3d Cir. 2000).  We are of the same mind.[15]  Yet the magnitude and evenness of the

> **"rights" the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim.**

508 U.S. at 329 (emphasis added).

[15]  If we err in our view, we are in good company.  *See In re McCarron,* 242 B.R. 479 (Bankr. W.D. Mo. 2000); *In re Flowers*, No. 98-11492, 1999 WL 118022 (Bankr. E.D. Va. Jan. 14, 1999); *Johnson v. Asset Management Group, LLC (In re Johnson)*, 226 B.R. 364 (D. Md. 1998); *In re Yi*, 219 B.R. 394 (E.D. Va. 1998); *Lam v. Investor's Thrift (In re Lam)*, 211 B.R. 36 (B.A.P. 9th Cir. 1997) appeal dismissed, 192 F.3d 1309 (9th Cir. 1999); *In re Perugini*, 234 B.R. 247 (Bankr. D. Conn. 1999); *In re Phillips*, 224 B.R. 871 (Bankr. W.D. Mich. 1998); *In re Reeves,* 221 B.R. 756 (Bankr. C.D. Ill. 1998); *In re Cerminaro*, 220 B.R. 518, 32 Bankr. Ct. Dec. (CRR) 708 (Bankr. N.D.N.Y. 1998); *In re Bivvins*, 216 B.R. 622 (Bankr. E.D. Tenn. 1997); *In re Smith*, 215 B.R. 716 (Bankr W.D. Tenn.

22

split in authority is surprising, as demonstrated by the growing

number of courts holding to the minority view.[16]  Also, the split

1998); *In re Scheuer*, 213 B.R. 415 (Bankr N.D.N.Y. 1997); *In re Cervelli*, 213 B.R. 900 (Bankr. D.N.J. 1997); *In re Geyer*, 203 B.R. 726 (Bankr. S.D. Cal. 1996); *In re Sanders*, 202 B.R. 986 (Bankr. D. Neb. 1996); *Associates Fin. Servs. Corp. v. Purdue (In re Purdue)*, 187 B.R. 188 (S.D. Ohio 1995); *Wright v. Commercial Credit Corp. (In re Wright)*, 178 B.R. 703 (E.D. Va. 1995), appeal dismissed without op., 77 F.3d 472 (4th Cir. Va. 1996)(unpublished table decision); *Vaillancourt v. Marlow (In re Vaillancourt)*, 197 B.R. 464 (Bankr. M.D. Pa. 1996); *In re Cavaliere*, 194 B.R. 7 (Bankr. D. Conn. 1996); *Castellanos v. PNC Bank, Nat'l Ass'n (In re Castellanos)*, 178 B.R. 393 (Bankr. M.D. Pa. 1994); *In re Mitchell*, 177 B.R. 900 (Bankr. E.D. Mo. 1994); *Norwest Fin. Ga. v. Thomas (In re Thomas)*, 177 B.R. 750 (Bankr. S.D. Ga. 1995); *In re Lee*, 177 B.R. 715 (Bankr. N.D. Ala. 1995); *In re Woodhouse*, 172 B.R. 1 (Bankr. D.R.I. 1994); *In re Sette*, 164 B.R. 453 (Bankr. E.D.N.Y. 1994); *In re Castellanos, 178 B.R. 393 (Bankr. M.D. Pa. 1994); In re Mitchell,* 177 B.R. 900 (Bankr. E.D. Mo. 1994); *In re Hornes, 160 B.R. 709 (Bankr. D. Conn. 1993);In re Moncrief*, 163 B.R. 492 (Bankr. E.D. Ky. 1993); *In re Kidd*, 161 B.R. 769 (Bankr. E.D.N.C. 1993); *In re Lee*, 161 B.R. 271 (Bankr. W.D. Okla. 1993); *In re Williams*, 161 B.R. 27 (Bankr. E.D. Ky. 1993); *In re Hornes*, 160 B.R. 709 (Bankr. D. Conn. 1993); *In re Plouffe*, 157 B.R. 198 (Bankr. D. Conn. 1993); *see also Howard v. National Westminster Bank (In re Howard)*, 184 B.R. 644 (Bankr. E.D.N.Y. 1995) (wholly unsecured nonconsensual judicial lien may be "stripped down" in a Chapter 7 case); *In re Gray*, 182 B.R. 15 (Bankr. W.D. Va. 1995) (denial of attorney's fees to secured creditor with no remaining collateral is not a modification); *In re Hutchins*, 162 B.R. 1014 (Bankr. N.D. Ill. 1994) (lender whose lien is eliminated by a foreclosure by the first mortgagee no longer has a security interest protected by § 1322(b)(2)); *cf. In re Cardinale*, 142 B.R. 42 (Bankr. D.R.I. 1992) (*pre- Nobelman* case).

[16]  *See In re Perry*, 235 B.R. 603 (S.D. Tex. 1999); *American General Finance, Inc. v. Dickerson*, 229 B.R. 539 (M.D. Ga. 1999); *Green Tree Consumer Discount Co. v. Miller (In re Miller)*, No. 99-13446, 1999 WL 1052509 (Bankr. E.D. Pa. Nov. 5, 1999); *In re Cater,* 240 B.R. 420 (Bankr. M.D. Ala. 1999); *In re Boehmer*, 240 B.R. 837 (Bankr. E.D. Pa. 1999); *In re Perkins*, 237 B.R. 658 (Bankr. S.D. Ohio 1999); *In re Cupp*, 229 B.R. 662 (Bankr. E.D. Pa. 1999); *In re Diggs*, 228 B.R. 611 (Bankr. W.D. La. 1999); *In re Tanner*, 223 B.R. 379 (Bankr. M.D. Fla. 1998); *In re Lewandowski*, 219 B.R. 99 (Bankr.

extends to the leading bankruptcy treatises,[17] but a number of other

---

W.D. Pa. 1998); *In re Bauler*, 215 B.R. 628 (Bankr. D.N.M. 1997); *In re Mattson,* 210 B.R. 157 (Bankr. D. Minn. 1997); *In re Shandrew*, 210 B.R. 829 (Bankr. E.D. Cal. 1997); *In re Fraize*, 208 B.R. 311 (Bankr. D.N.H. 1997); *In re Barnes*, 207 B.R. 588 (Bankr. N.D. Ill. 1997); *In re Jones*, 201 B.R. 371 (Bankr. D.N.J. 1996); *In re Barnes*, 199 B.R. 256 (Bankr. W.D.N.Y. 1996); *In re Witt*, 199 B.R. 890 (W.D. Va. 1996); *In re Neverla*, 194 B.R. 547 (Bankr. W.D.N.Y. 1996); *In re Johnson*, 160 B.R. 800 (S.D. Ohio 1993) (section 1322(b)(2) prevents modification of a mechanic's lien which is entirely undersecured).

[17]  Colliers adopts the majority view:

> The *Nobelman* opinion strongly suggests . . . that if a lien is completely undersecured, there would be a different result.  The opinion relies on the fact that, even after bifurcation, the creditor in the case was "still the 'holder' of a 'secured claim' because petitioners' home retain[ed] $23,000 of value as collateral."  If the creditor had held a lien on property that had no value (perhaps because the property was fully encumbered by prior liens), then under this analysis it would not have been a "holder of a secured claim" entitled to protection by § 1322(b)(2).

5 COLLIER ON BANKRUPTCY, § 1322.06[1][a] at 1322-16 (Lawrence King 15th ed. 1989).
The minority view is urged by Judge Keith M. Lundin, United States Bankruptcy Judge for the Middle District of Tennessee, in his treatise on chapter 13 bankruptcy, which states:

> Although the bank's claim in *Nobelman* was partially secured by real property that was the debtor's principal residence, Justice Thomas's analysis ties the protection from modification in § 1322(b)(2) to the existence of a "claim" secured by a lien on real property, without regard to whether the claim holder would also have an allowed secured claim after valuation and analysis under § 506(a).  The clear implication of this analysis is that even a completely unsecured claim holder "secured" only by a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2), notwithstanding that such an "unsecured" lienholder could not have an allowable secured claim under § 506(a).  Although the concept of an "unsecured

scholarly commentators are not so evenly divided; they favor the majority view.[18]

### 6. Resolution Based on the Text of the Statutes

The perceived ambiguity in the *Nobelman* opinion stems first from Justice Thomas's focus on the "rights" of holders of secured claims faced with potential bifurcation, and second from his expansive reading of the term "claims." Conversely, his discussion of the operative effect of § 506(a) was succinct. The fact that bifurcation is impermissible under § 1322(b)(2) is irrelevant to the case at hand, one that does not involve the bifurcation of an undersecured lien. Instead, it is the first part of Justice Thomas's analysis that is fundamental to the resolution of this case, namely the confirmation that § 506(a) is the starting point

secured claim" is impossible under § 506(a), Justice Thomas's focus on the "rights" of the "holders" of a "claim secured only by ..." in § 1322(b)(2) extends the protection from modification to claims that are secured by a lien on the debtor's principal residence, without regard to the allowance or disallowance of secured claims under § 506(a). In other words, the trigger for Justice Thomas's protection of rights analysis is the existence of a lien, not the presence of value to support the lien.

LUNDIN, KEITH M., CHAPTER 13 BANKRUPTCY, § 4.46, at 4-56 (2d ed. 1994).

[18] *See, e.g.*, Jane Kaufman Winn, *Lien Stripping After Nobelman*, 27 LOY. L.A. L. REV. 541, 584 (1994); Veryl Victoria Miles, *The Bifurcation of Undersecured Residential Mortgages Under § 1322(b)(2) of the Bankruptcy Code: The Final Resolution*, 67 AM. BANK. L.J. 207, 285 (1993); Comment, Bankruptcy – *How Judicial Interpretation of 11 U.S.C. § 1322(c)(2) has Given Wholly Unsecured Loans a whole Lot of Undeserved Security*, 24 WM. MITCHELL L. REV. 713 (1998).

in the analysis. *See Nobelman*, 324 U.S. at 328.

Given the express instruction to visit § 506(a) first, it is no wonder the majority of courts hold to the same reasoning put forward by Debtor. If it is correct to "look[] to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim," then it stands to reason that valuation will control the determination of the mortgagee's security interest -- i.e., whether it is a secured or unsecured claim. "Once we accept that courts must apply § 506(a), then it follows, even under *Nobelman*, that a wholly unsecured mortgage holder does not have a secured claim." *In re McDonald*, 205 F.3d 606, 611 (3d Cir. 2000). In the case of a wholly undersecured junior mortgage, the valuation function of § 506(a) obviates the need to even consult § 1322(b)(2). After all, Justice Thomas's determination that the creditor bank held a secured claim rested upon the fact that the lien was supported by at least some collateral value in the home. See id. at 329. Unlike the bank in *Nobelman*, which held both a secured claim and an unsecured claim, Tara Colony holds only an unsecured claim. Without an allowed secured claim, a creditor cannot invoke § 1322(b)(2). *See In re Woodhouse*, 172 B.R. 1, 2 (Bankr. R.I. 1994) ("any 'rights' [a wholly undersecured creditor] may assert under *Nobelman* by virtue of its security documents are illusory, hyper-technical, and possibly relevant only in law review articles").

Those courts holding to the minority view are unable to explain how § 506(a) can apply and yet not actually serve the valuation and claim determination purpose for which it was crafted. Instead, these courts argue that the rights of a lienholder should not turn on the vagaries of a property valuation. *See In re Perry*, 235 B.R. 603, 607 (S.D. Tex. 1999) ("Considering the inexact and fluctuating nature of the valuation process, this result is needlessly harsh."); *Dickerson*, 229 B.R. at 543 ("This would place too much emphasis on the valuation process, which is inexact and is subject to fluctuations in the market.").[19] These courts are left to argue that § 506(a) and § 1322(b)(2) are essentially in conflict and that § 1322(b)(2) prevails. *See, e.g.*, *id.* at 542. However, we know this position to be untenable, since it was the one we espoused in our *Nobleman* opinion, a position unambiguously rejected by the Supreme Court. *See Nobelman*, 324 U.S. at 328-29.

The minority courts insist that the focus remain on the existence of a lien regardless of whether there is even a penny of value to which it can attach. Rather, if the claim is secured by a lien on the residence, that state law label must prevail over the operation of the Bankruptcy Code. We reject this reasoning as have both appellate panels that have ruled on the issue. *See McDonald*, ("We do not think there is any meaningful sense in which a court

---

[19] It should be noted that Congress's intent to protect home lenders does not necessarily mean that they intended to entirely insulate them from changing market conditions.

27

could be said to apply § 506(a) if the sole function of the section was simply to adopt the state-law label of the claim as secured. . . . Courts hardly need to perform a valuation of the collateral to adopt the original state-law label of the claim as secured."); *In re Lam*, 211 B.R. at 41 ("*Nobelman's* reference to section 506(a) is 'meaningless unless some portion of the claim must be secured under § 506 analysis before the creditor is entitled to retain the rights it has under state law."")(quoting *In re Williams*, 161 B.R. 27, 29-30 (Bankr. E.D. Ky. 1993)).[20]

We find the minority view to be a misreading of *Nobleman*, that creates a false conflict in the Bankruptcy Code. As the Third Circuit explained, the two provisions at issue can be easily reconciled:

> Perhaps the clearest explanation of how the Court's discussion of the two sections can be reconciled is to point out that while the antimodification clause uses the term "claim" rather than "secured claim" and therefore applies to both the secured and unsecured part of a mortgage, the antimodification clause still states that the claim must be "secured only by a security interest in

---

[20] We are unconvinced that Justice Thomas's focus on "rights" and the expansive interpretation of the term "claim" represents a tectonic shift in the focus of the Bankruptcy Code. Instead, the appropriate focus remains on the nature of the claim not the nature of the holder of the claim. *See In re Hornes*, 160 B.R. 709, 718 (Bankr. D. Conn. 1993). In fact, the legislative history reflects Congress's intent to differentiate between secured and unsecured *claims* not secured and unsecured creditors. *In re Lam*, 211 B.R. at 41 ("The code does not generally classify creditors based on the existence of a piece of paper purporting to give a creditor rights in specified collateral, but rather on whether a creditor actually holds a claim supported by valuable estate property.") (quoting *In re Hornes*, 160 B.R. at 715.).

... the debtor's principal residence."  If a mortgage holder's claim is wholly unsecured, then after the valuation that Justice Thomas said that debtors could seek under § 506(a), the bank is not in any respect a holder of a claim secured by the debtor's residence. The bank simply has an unsecured claim and the antimodification clause does not apply. On the other hand, if any part of the bank's claim is secured, then, under Justice Thomas's interpretation of the term "claim," the entire claim, both secured and unsecured parts, cannot be modified. We think this reading reconciles the various parts of the Court's opinion.

*In re McDonald*, 205 F.3d at 612 (footnote omitted)(citation omitted).[21]

---

[21]  In his FED R. APP. P. 28J letter to this Court following the Third Circuit's ruling in *McDonald*, counsel for the United States Trustee argues that the reasoning in *McDonald* is flawed.  The Trustee contends that the Supreme Court rejected this same analysis in *Dewsnup v. Timm*, 502 U.S. 410 (1992).  The Trustee points to the holding in *Dewsnup* in which the Court determined that lien stripping was not an option available to Chapter 7 debtors:

> [W]e hold that § 506(d) does not allow petitioner to 'strip down' respondent's lien, because respondent's claim is secured by a lien and has been fully allowed pursuant to § 502.

502 U.S. at 416.  Purportedly, *Dewsnup's* ban on lien stripping carries over with similar effect on Chapter 13 debtors.

To the contrary, the Supreme Court's holding was expressly restricted to Chapter 7 liquidation cases, and is inapplicable to the reorganization bankruptcy chapters. *See In re Young*, 199 B.R. 643, 650 (Bankr. E.D. Tenn. 1996).  As one commentator explained:

> The rationales advanced in the *Dewsnup* opinion for prohibiting lien stripping in Chapter 7 bankruptcies, however, have little relevance in the context of rehabilitative bankruptcy proceedings under Chapters 11, 12, and 13, where lien stripping is expressly and broadly permitted, subject only to very minor qualifications. The legislative history of the Code makes clear that lien stripping is permitted in the reorganization chapters.

Winn, *supra* note 18, at 554-55 (footnote omitted).

In sum, we find no tension between the valuation and claim determination provisions of § 506(a) and the antimodification provision of § 1322(b)(2). As applied to Tara Colony's claim, Debtor properly opted for a valuation of his principal residence pursuant to § 506(a). That valuation revealed that the junior lien on the property was unsupported by any value in the residence after satisfaction of the first mortgage. Consequently, Tara Colony holds only an unsecured claim, and therefore, may not invoke the antimodification protection of § 1322(b)(2). The bankruptcy court erred when it refused to confirm Debtor's proposed plan.

### 7. *Only the Majority View Comports with Legislative History and Serves Public Policy*

The result we reach today is compelled by consideration of the Bankruptcy Code and the *Nobelman* decision. The policies underlying the mortgage antimodification provisions further bolster our position. A review of the legislative history of § 1322(b)(2) reveals that the minority view is unsupported by the legislative history of § 1322(b)(2) and ill serves public policy in a number of ways. But just as the minority view runs far afield of the purpose of the antimodification provision, a review of recent bankruptcy reforms demonstrates that the minority view's breach with congressional intent is only widening.

In his brief concurring opinion in *Nobelman*, Justice Stevens

explained that the result reached by the unanimous court comported with the legislative history of § 1322(b)(2) which reflected Congress's intent to bestow "favorable treatment" upon residential mortgage lenders "to encourage the flow of capital into the home lending market." *Nobelman*, 508 U.S. at 332 (Stevens, J., concurring). The courts holding to the minority view contend that Congress intended to provide protection to all lenders operating in the mortgage lending markets without differentiating between home-purchase (i.e., first mortgage) lending and home equity or consumer (i.e., junior mortgage) lending. Under this reasoning, § 1322(b)(2) illustrates Congress's intent to unequivocally protect all lending -- as long as the debt is secured by the debtor's principal residence -- regardless of the purpose of the loan.[22]

---

[22] Although our review of cases involving wholly undersecured junior lienholders revealed several in which the subordinate lienholder was either a homeowners' or condominium association, a substantial majority involve lenders providing consumer spending loans. *See, e.g.*, *In re Perry*, 235 B.R. 603 (S.D. Tex. 1999) (homeowners' association); *In re Robinson*, 231 B.R. 30 (Bankr. D.N.J. 1997) (condominium association). We are mindful that different policy considerations are at play when these associations' liens are at issue than the liens of consumer spending lenders. Homeowners' assessments are frequently a cost-effective means of repairing a subdivision's streets and maintaining adjoining public rights of way, preventing nuisances that can arise from the failure of nearby property owners to keep their tracts free from trash or pests. Similarly, assessments can finance on-site private security to prevent crime and reduce the burden on public-financed law enforcement. Finally, by maintaining established quality standards within the subdivision, assessments enhance the property values of individual residences thus contributing to an increase area tax base. Condominium assessments are often the sole means of providing for the maintenance of common areas or shared utilities.

In contrast, the majority of courts analyzing the legislative history on this point have concluded that Congress did not view all mortgage lending as such an undifferentiated enterprise. *See, e.g.*, *In re Pouffe*, 157 B.R. 198, 200 (Bankr. Conn. 1993). Rather, § 1322(b)(2) was enacted to increase lending for home purchases by providing home mortgage lenders greater protection under the Bankruptcy Code. "[B]ecause second mortgages are not in the business of lending money for home purchases, the same policy reasons for protection of first mortgages under section 1322(b)(2) do not exist for second mortgages." *In re Lam*, 211 B.R. at 41; *see also* Miles, *supra* note 18 ("[M]ost cases involving a cramdown are cases where the property has been overappraised or junior lienholders have taken mortgages against oversecured property, examples of creditor abuse in mortgage lending that do not merit protection by Congress."). Because secondary lending is targeted primarily at personal spending, allowing wholly undersecured second

---

But while we can acknowledge a markedly different *purpose* for the lien, in our analysis, we can look only to the *manner* in which that claim is structured (i.e., by a subordinate lien or mortgage). Our decision to today does not reflect a belief that Congress specially targeted association assessments secured by a subordinate lien for inferior treatment, but simply that such assessments fall alongside categories of lending that lie solidly outside the narrow zone of protection crafted by Congress in § 1322(b)(2). Were we free to draw fresh lines of protection, we might decide that some form of reconfiguration is in order to take account of this limited subset of cases. However, Congress has defined the boundaries of antimodification protection with the larger subset of cases in mind, and we cannot not disturb its judgment. If these types of assessments are moved beyond the reach of § 506(a) it will be at Congress's behest.

mortgages under the umbrella of the antimodification clause would be unlikely to positively impact home building and buying. *See In re Lam*, 211 B.R. at 41. "The holder of a second mortgage is apt to be very much like other general creditors, and therefore it seems reasonable that a wholly unsecured second mortgage will be subject to the same rules that apply to other secured claims-- i.e., a claim not secured by any current value in the specified collateral is deemed an unsecured claim." *In re McDonald*, 205 F.3d 606, 613 (3rd Cir. 2000).

Not only is the minority view mistargeted, but adoption of the minority view would upset the delicate balance that Congress established between rights of purchase-money lenders and over-extended debtors. This interpretation would jeopardize one of the prime benefits of Chapter 13 -- the ability of a debtor to retain existing assets -- by creating an incentive for lenders to take a security interest in a borrower's principal residence notwithstanding the absence of value in the residence for the creditor. *See In re Lam*, 211 B.R. at 41 ("[S]uch a result might encourage junior mortgagees to intentionally obtain a mortgage on property that is already overburdened with senior mortgages for the sole purpose of avoiding modification of his or her pre-petition contractual rights.") (citing *In re Neal*, 10 B.R. 535, 537 (Bankr. S.D. Ohio 1981) and *In re Harris*, 94 B.R. 832, 836 (D.N.J.1989)). As one commentator elaborated, this is not an abstract problem:

In addition, several other policy justifications support denying antimodification protection to junior lienors. One has to do with predatory lending practices prevalent in communities that have traditionally been denied access to finance on conventional terms. Although the practice of granting home equity loans to permit homeowners to cash out their equity in houses that may have appreciated substantially since purchase may not raise significant policy issues in many instances, a real problem arises when low-income households--in which home equity may be the only significant asset--are pressured into granting multiple liens on their homesteads by unscrupulous lenders. Predatory lenders may target members of [these low-income] communities threatened with foreclosure by refinancing their debt at astronomical interest rates. The ability of such junior lienors to hide behind the antimodification provision of § 1322(b)(2) is particularly offensive to public policy.

Jane Kaufman Winn, *Lien Stripping After Nobelman*, 27 LOY. L.A. L. REV. 541, 584 (1994). In essence, an overly expansive reading of § 1322(b)(2) allows opportunistic lenders to convert what would normally be dischargeable unsecured debt into nondischargeable secured debt. Lenders are able to obtain high interest rates on their loans while avoiding the concomitant risk usually associated with such lending. *See* Comment, *supra* note 18 at 714-15. The less expansive view of § 1322(b)(2) that we embrace is in accord with the purpose -- acknowledged by both sides of this debate -- of promoting home purchase lending, while at the same time withholding incentives to opportunistic secondary lenders to acquire unsecured liens in order to defeat potential Chapter 13 plans.

Just as it is clear that the legislative history of § 1322(b)(2) does not support the minority view, a review of subsequent legislative activity also counsels against over

extension of antimodification protection. In an outstanding opinion, the Bankruptcy Appellate Panel for the Sixth Circuit compiled a detailed history of the legislative developments between 1991 and the passage of the 1994 bankruptcy reforms. *See First Union Mortgage Corp. v. Eubanks* (*In re Eubanks*), 219 B.R. 468, 473-77 (B.A.P. 6th Cir. 1998). Legislative history of the Bankruptcy Reform Act of 1994 "reveals that between 1991 and 1994 both houses of Congress repeatedly studied ways to reduce the protection of subordinate and 'short term' mortgages in Chapter 13 cases." *In re Eubank*, 219 B.R. at 473-77. Specifically, "Congress considered the need for [an] exception to § 1322(b)(2) continuously." *Id.* at 479. Thus, § 1322(c)(2) evinces a congressional determination to further define the proper balance between the interests of debtors and home mortgage creditors. By enactment of § 1322(c)(2), Congress sought to withdraw antimodification protection from certain classes of "second mortgages," including "short-term, high-interest rate home equity loans." *In re Perry*, 235 B.R. 603, 608 (S.D. Tex. 1999)(quoting *In re Eubanks*, 219 B.R. at 480). As the *Eubanks* court explained, "[r]arely will this provision affect the holder of a traditional residential, long term mortgage, because any long term mortgage that is payable within the term of a Chapter 13 plan will not likely be undersecured." 219 B.R. at 480 The focus of § 1322(c)(2) is short term, often high interest, second and nontraditional mortgages, to which those in financial distress

sometimes fall victim.". *See In re Mattson*, 210 B.R. at 161 ("The section will typically apply to second mortgages such as this one, which are based very little on the value of the home and more on the leverage provided by having a mortgage on a debtor's homestead. A true first mortgage, payable over a longer term . . ., will rarely, if ever, be undersecured, especially when the last payment is coming due during the term[ ] of a plan.").[23]

The minority view fails to recognize that the enactment of § 1322(c)(2) helps to bring congressional intent into even clearer focus. Passage of this exception to § 1322(b)(2) demonstrates that Congress intends to maintain the protections afforded home mortgage lenders, while preventing "thinly disguised personal" lending from taking advantage of those protections. *See* Comment, *supra* note 18, at 740. We would be ill advised to extend antimodification protection to wholly undersecured junior mortgages when such an interpretation would deviate so strongly from the manifest intent of Congress.

---

[23] The facts of *In re Mattson* are illustrative of just such lending practices. Mattson bought a $49,000 home by obtaining a loan for $47,405, secured by a priority mortgage on the homestead. The following year, Mattson received an unsolicited offer for a debt consolidation loan from Commercial Credit Consumer Services, Inc. Mattson applied for a $5,000 loan to refinance personal credit card debt, but was talked into a $10,000 loan, secured by a second mortgage on her home. No inquiry was made by the lender about the value of her home or how heavily it was encumbered with existing mortgage debt. She agreed to a five-year repayment schedule. Two years later Mattson was unable to make the loan payments and filed for protection under Chapter 13.

Many courts have also expressed concern that over-extension of § 1322(b)(2)'s antimodification protections would diminish the appeal of Chapter 13 and lead to an increase in either Chapter 11 reorganizations or Chapter 7 liquidations. *See In re McDonald*, 205 F.3d at 614 ("[A] debtor who has outstanding balances on multiple mortgages exceeding the current value of the debtor's home often will not try to keep a home encumbered with so much debt, and instead will turn to a Chapter 7 bankruptcy and allow the home to be sold in liquidation."); *In re Hornes*, 160 B.R. 709, 719 (Bankr. D. Conn. 1993)(explaining that adoption of the minority view "might induce more debtors who would qualify for chapter 13 relief to file chapter 11 cases, in which all unsecured claims may be treated as such, a more expensive and less expeditious alternative."). The majority view better serves the policy imperatives of the Bankruptcy Code by encouraging debtors to first consult Chapter 13 before seeking either to reorganize pursuant to the more expensive and cumbersome Chapter 11 or liquidate pursuant to Chapter 7.

In conclusion, the legislative history and general policy considerations reinforce our holding that the Bankruptcy Code does not permit a wholly undersecured lienholder to rely upon the antimodification protections afforded mortgagees whose secured interest in the homestead is supported by at least some value. "It is not consistent with the statutory scheme of Chapter 13, and the Bankruptcy Code's bifurcated treatment of [] secured and unsecured

37

claims ... to assume that a junior mortgagee on real property which is already overburdened by senior mortgages, could insist on being treated as a creditor with a secured claim and insist on full payment of its claim based upon the pre-petition contractual arrangement with the debtor." *In re Plouffe*, 157 B.R. 198, 200 (Bankr. D. Conn. 1993).

## C. § 1322(c)(2)

Debtor advances an alternative ground for reversal based on the exception to § 1322(b)(2), discussed *supra*, enacted as part of the Bankruptcy Reform Act of 1994. This exception, found at § 1322(c)(2), provides:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law--
>
> * * *
>
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

11 U.S.C. § 1322(c)(2)(1999). We find Debtor's contention that the Tara Colony annual maintenance assessment falls within the ambit of this exception thoroughly unpersuasive.

Tara Colony's claim is for the maintenance assessment due January 1 preceding the date Bartee filed for bankruptcy. Bartee argues that § 1322(c)(2) applies because the sole payment at issue came due prior to the expiration of his plan. If § 1322(c)(2)

applies, then under § 1325(a)(5), the debtor may cramdown the claim "to the value of the collateral securing the debt" -- in this case, $0. *In re Eubanks*, 219 B.R. at 471; *see In re Young*, 199 B.R. 643, 647 (Bankr. E.D. Tenn. 1996).

Presented with a virtually identical factual scenario, the *Perry* court rejected the debtor's argument that § 1322(c)(2) applied because an assessment payment came due during the life of the debtor's plan. *See In re Perry*, 235 B.R. at 608-09. As the *Perry* court explained, application of § 1322(c)(2) would require "last payment" due to be read as meaning "most recent" payment due. *See id.* at 608. This interpretation is in conflict with the meaning that most courts give "last payment," *see id.*, and is unsupported by the legislative history of § 1322(c)(2). *See In re Eubanks*, 219 B.R. at 473-77. Consequently, courts apply § 1322(c)(2) solely to claims arising from mortgages that mature prior to the expiration of a debtor's chapter 13 plan. *See In re Perry,* 235 B.R. at 608; *see also In re Eubanks*, 219 B.R. at 469; *In re Bagne*, 219 B.R. 272, 273 (Bankr. E.D. Ca. 1998). The better reading is that "the 'last' payment due under the original schedule in § 1322(c)(2) refers to the 'final' payment and not the most recent payment." *In re Perry,* 235 B.R. at 608.

Furthermore, the one-time yearly assessment cannot properly be characterized as having an "original payment schedule" similar to that of a mortgage. *Id.* at 609. The assessment is calculated each

year and comes due upon assessment. The payment of the assessment does not pay down an existing debt. Thus, adoption of *Debtor's* interpretation would render the "original payment schedule" language superfluous. *See In re Perry*, 235 B.R. at 608-09.

Finally, we are unable to find, and Debtor is unable to provide a citation to, any case in which a court has applied § 1322(c)(2) to a claim stemming from an annual assessment lien. Accordingly, we hold that an annual assessment *due upon assessment* does not meet the requirements of § 1322(c)(2).

## IV. CONCLUSION

For the reasons stated above, we hold that a wholly unsecured lien is not subject to the antimodification clause in § 1322(b)(2). Also, an annual real property assessment does not fall within the class of secured interests encompassed by § 1322(c)(2). The judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART. This case is to be REMANDED to the Bankruptcy Court for further proceedings regarding confirmation of Debtor's Chapter 13 Plan.